No. 20,898.

REBECCA HARVEY, *Appellee*, v. THE CITY OF BONNER SPRINGS, *Appellant*.

SYLLABUS BY THE COURT.

1. MOB VIOLENCE—*Death—Action for Damages—Pleadings—Evidence.* In an action against a city under section 3822 of the General Statutes of 1915, to recover damages in consequence of the action of a mob, the petition is held sufficient to state a cause of action, and the plaintiff's evidence is held sufficient as against a demurrer.

2. SAME—*Weight of Evidence for Jury.* Upon the facts stated in the opinion, it is held that the court committed no error in refusing to direct a verdict for the defendant.

3. SAME—*Defense—Sheriff's Posse—Deceased Resisting Arrest—Instructions.* In an action against a city to recover damages for the acts of an alleged mob in causing the death of plaintiff's husband, the answer alleged that he had committed a felony by shooting at the city marshal with a revolver; that the city marshal, who was also a deputy sheriff, summoned a posse to aid in arresting him; that he resisted arrest and was killed while in the act of drawing his revolver; and that the killing was justified. *Held,* that the instructions given correctly stated the law upon the issue raised by the answer.

4. SAME—*Attempting Arrest of Deceased—Good Faith Question for Jury.* In such a case it is held that it was a question of fact for the jury to determine whether the plaintiff's husband had committed a felony, and

also whether the crowd of men around plaintiff's house were acting in good faith in attempting to arrest her husband and shot him in the honest belief that it was necessary to do so, or whether, as plaintiff claimed, they formed during the time they were assembled a purpose and intent to take his life, and that in carrying out that unlawful purpose he was killed.

5. SAME—*Wrongful Death—Verdict for Plaintiff Sustained.* On the facts stated in the opinion it is held that the court cannot declare as a matter of law that the persons summoned by the officer in the present case did not constitute a mob within the meaning of the statute, since the motive which actuated them, not only when they assembled, but also at the time the death of plaintiff's husband was brought about, became questions of fact; and if on these vital issues reasonable minds might draw different conclusions from the evidence, the verdict in plaintiff's favor cannot be disturbed.

Appeal from Wyandotte district court, division No. 3; WIL-LIAM H. MCCAMISH, judge. Opinion filed December 8, 1917. Affirmed.

*James F. Getty,* of Kansas City, for the appellant.

*Henry Dean,* and *J. E. McFadden,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Rebecca Harvey brought this action against the city of Bonner Springs, a city of the third class, to recover damages for the death of her husband. The jury returned a verdict in her favor for $8,500, and judgment was rendered thereon, from which the city appeals.

The action is sought to be maintained under the provisions of section 3822 of the General Statutes of 1915, which provides:

"All incorporated cities and towns shall be liable for all damages that may accrue in consequence of the action of mobs within their corporate limits, whether such damages shall be loss of property or injury to life or limb."

The petition alleged:

"That on said 18th day of December, 1913, a large number of persons, residents and citizens of the town of Bonner Springs, Kansas, congregated and assembled at and around the home of this plaintiff and her husband, Rolla Harvey, within the corporate limits of said Bonner Springs, and while so assembled, and while the said Rolla Harvey was coming out of his home at their direction and request, said assemblage

of persons unlawfully assaulted the said Rolla Harvey with shot guns and revolvers and inflicted upon him mortal wounds which caused his death."

The answer alleged that Rolla Harvey had committed a felony on the night before his death by shooting at the city marshal with a revolver; that Easling, the city marshal, who was also a deputy sheriff, summoned a posse to his aid in attempting to arrest Harvey the next morning; that Harvey resisted the officer and the posse, shot at them, and that on being asked to surrender, refused, and that while he was in the act of drawing his revolver one of the posse shot him in self-defense, and that the killing was justified.

Rolla Harvey, the plaintiff's husband, at the time of his death was thirty-nine years old. He was a structural steel mechanic in the employ of a bridge company, for which he had been working for six or eight years and held a position as foreman, earning from $4.50 to $6.00 a day. The family consisted of himself, his wife, and two children, the eldest a boy of less than five years, and a girl less than a year old. For eighteen months Harvey had been a tenant of the city, living in one of two upstairs apartments in the city hall.

The city hall at Bonner Springs is a two-story brick building at the corner of Second and Cedar streets. It is 53 feet long north and south, and 42 feet wide east and west; it fronts south on Second, and its west side abuts on Cedar street, which runs north and uphill; the yard in the rear of the building is above the street, and about on a level with the second story. Extending across the rear of the second story is a porch five feet wide, and from the west end of it steps extend down to Cedar street. On the elevated ground in the rear of the building, and facing west, is what is termed in the evidence the "Crow house," the porch of which is about 7 feet wide and 23 feet long, and runs at right angles to the porch on the rear of the upstairs of the city building. The south end of the Crow porch is only three and a half feet from the city-hall porch, and practically on a line with the door leading from the hallway out upon the city-hall porch. This hallway divides the two apartments upstairs in the city building, on the west side of which lived Rolla Harvey and his family, the east side being occupied by Easling, the city marshal, and his wife. The premises

occupied by Rolla Harvey and his family consisted of three rooms, the first room from the north was the kitchen; the next to the south was the living room; and the third was the bedroom; each of these rooms was connected by a door leading out into the center hall. Each room had a window opening west on Cedar street, and the kitchen had two windows opening north on the porch.

By the special findings the jury found that Harvey had committed no felony as claimed by the city.

The evidence introduced by the plaintiff in reference to what occurred the night before was, that about half past eleven o'clock Harvey and a man by the name of Rhodes came down from the Harvey home to the street. Easling, the city marshal, who lived across the hall from Harvey in the same building, followed them downstairs and spoke to them on the street and said: "Ain't you out kind of late to-night?" One of the men replied, "I don't know as it's any of your damn business." To which Easling replied, "I will make it some of my business." The testimony of the witness Adair as to what transpired then was as follows:

"And just then somebody busted him, hit him, knocked him out in the street, knocked him fifteen or twenty feet, and he raised up and shot the first time through the air, sitting down and shot up that way, the next time he shot up that way, north, Easling did. I don't know which one busted Easling; the way he rolled, they must have both hit him. Harvey went in the house, Rhodes ran up the hill, Easling ran toward the depot after he fired those two shots. There were no other shots fired then at that time than the ones I mentioned."

The evidence of the plaintiff went to show that when the Harvey family awoke from their sleep the next morning, they found their home surrounded by men with pistols and shotguns. Sometime after Harvey got up, he dressed, went to the kitchen and washed. He then stepped out on the porch to empty the wash basin. There is a conflict in the evidence as to what then occurred. The plaintiff's evidence tended to show that Harvey was at once met with a volley of shots from revolvers and shotguns fired by men, some of whom were standing under the roof of the porch on the Crow house, others around the corners of buildings and behind a tree. As a result of this fusilade, one of the posse, Webber, was shot in the fleshy part of the leg, undoubtedly by a shot from Harvey's

revolver; Harvey was shot in the left breast by a shotgun fired by one of the posse. Harvey went back into his house, told his wife he had been wounded, and called to his little boy to go for a doctor. Mrs. Harvey was afraid to let the child go and said that she would summon aid. She went to the window on the west side of the bedroom, for the purpose of calling to outsiders, and as she raised the blind she was confronted with a shotgun in the hands of another of the posse, O'Donnell, who had been stationed across the street. She screamed and got back from the window, and started to cross the hall for the purpose of using the telephone in the Easling apartments. When she reached the hall she was ordered back by Milstead, who pointed a shotgun towards her, and she retreated into one of the rooms. Milstead was standing at this time only a few yards from her on the porch of the Crow house directly in line with the hallway.

An interval of about fifteen minutes occurred between the first and the second shooting. During this lull in the hostilities, and while the Harvey family were in their rooms, Easling, the city marshal, who had summoned the posse, said, "Well, I will just shoot in the window once and see if I can raise him." He then fired with a shotgun through the screen in the west window. When this shot was fired Mrs. Harvey came out into the hall again and Milstead asked, "Will he come out? Will he surrender?" She said, "Well, I will see." She went in and told her husband that they wanted to know if he would surrender, and Harvey said: "Yes, tell them to come on in." She then went out in the hall and told Milstead what her husband had said, and Milstead replied, "We will never come in there, tell him to come out." Mrs. Harvey then went back to her husband and told him they said for him to come out, they would n't come in; and he got up and went out; she went with him. She testified that when Harvey went out, she went out the kitchen door with him; she had the children with her, the baby in her arms, and the little boy by her side. Harvey was a little in advance of her on the porch; she stood in the doorway of the hall, when some one said, "Go back in there; put them children back in there." "Get the children out of the way." "Get in there"; that they all had their guns in their hands, and she put the little boy back and stepped back herself; and just as

she stepped back, and as her husband started to raise his arms, they fired, and he staggered up against the door casing, turned, walked back into the kitchen, and fell over on his face, dead. "He did not have any gun in his hands or weapon in his clothes at that time."

Timmons, a farmer living near Bonner Springs, a friend of Harvey in his lifetime, was a witness for plaintiff. He was on the street near the city hall just before the second shooting occurred. He observed the parties had guns, and he talked with O'Donnell who was standing across the street from the city hall armed with a shotgun. When Timmons learned who it was they were trying to arrest, or wanted, he said to O'Donnell, "I will get Rolla for you," but O'Donnell replied, "No, Timmons, we are going to get him." The witness said, "All right, if you want to get into trouble, go ahead," and turned around and went away and left him.

Mr. Longfellow, who was mayor of the city, and who had been sheriff of the county for two terms, was a witness for the defense. His testimony is, that the night before, when Marshal Easling consulted with him with reference to the trouble with Harvey, he advised him to get some guards to guard the house until after daylight. "And I told him that I believed when the whisky died out on him, he would surrender without any trouble. They left my house and went away." He further testified that a little after seven o'clock the next morning he was present at the first exchange of shots between the besiegers and Harvey. There were five persons in the crowd besides himself at that time. He described the position of the men surrounding the house; Easling, O'Donnell and Lawrence were at the corner of the house, and Webber about opposite the center of the porch. Milstead, it appears, was behind a tree in the yard. During the shooting, the witness heard Webber say, "I am shot," and Webber then took his shotgun, aimed in the direction where Harvey stood, and fired. After the first shooting, the mayor left and went back to his work.

O'Donnell was a witness for the defense. About one o'clock the night before the shooting he heard Easling direct Webber to stay at the back of the building and guard it. Easling directed the witness to go and get a revolver. Webber made some reference to having a shotgun and Easling told him to get it.

Easling gave orders that they were all to be at the city hall at daylight. The witness arrived at the scene with Mayor Long-fellow and Milstead. When he arrived there were present besides himself, Milstead and the mayor, Easling, Webber and Norvall Lawrence.

"Harvey was just in the act of coming out of the door, pushing the screen open when I first saw him. The porch is 5 feet wide according to the plat. . . . I should say he took at least two steps from the door, a little left of what would be straight forward; I observed him with a wash pan in his hand. . . . My impression was, and is yet, that at first he had both hands on the pan or near the pan. Then Marshal Easling commanded him to surrender. He told him to consider himself under arrest; that he was under arrest and to throw up his hands, and began immediately to advance over the end of the Crow porch toward Mr. Harvey. . . . When he said that Harvey began to back into the door; he went back quickly. . . . Easling fired. I saw Harvey in the act of shooting. I heard two reports and saw the flashes from both Easling and Mr. Harvey; my impression is that Mr. Easling's gun was fired first; always has been my testimony all the way through, and is yet. . . . After those two shots the other persons out there were firing. I saw old man Webber fire; he had a shotgun. I heard Webber say he was hit, then I saw him fire. . . . Quite soon after he (Easling) fired twice out of his revolver, he asked me for this revolver; he said, 'Give it to me'; after I gave him the revolver, he shot Mr. Harvey with it or shot in that direction. I couldn't tell how many times. . . . There was a good deal of shooting there in the instant, or minute, or a short time. Those that I saw were all pointed at Rolla Harvey as he stood there in the hallway; they were all pointed in that direction. That is the reason I said in my direct examination, 'I expected to see him fall dead in his tracks at any time'; you could not understand why he wasn't killed; they were all shooting at him, that is in that direction."

After Harvey went into the house, the witness went and got a shotgun and, at the direction of Easling, took a position in the street to prevent Harvey from escaping from that side of the house.

This witness also testified:

"I heard Easling say immediately after Milstead fired that last shot, 'Give him the other barrel.' "

In regard to what occurred at the second shooting, Mr. Milstead, the man who fired the fatal shot, testified:

"After Harvey went back into the house, I went from there to my rooms and got a shotgun. I went to go and get a shotgun because Easling told me to go and get a gun, if I ain't mistaken. . . . When I pulled up my gun and shot at him, he stood right there in the hall-

way. I aimed right at him. . . . When I shot he staggered back and turned into the room out of my sight. My shot was the only shot that was fired at that time. When I fired that shot, Easling was standing right near me. . . . I don't remember whether Easling said, 'Give him the other barrel,' or not. I would n't say positive whether he told me to shoot again or not. I don't recall it if I said 'No, that got him.' I don't recall it if I said it; I would not say that I did not say it.

"During the lull I heard Mr. Easling say; 'Well, I will just shoot in the window once and see if I can raise him.' He did shoot, I could n't say whether he shot into the window or not. I seen the shot up in the kitchen window after that."

"Q. Was there anybody there, either Mr. Harvey or his wife, or those two little babies, in sight of you at the time that shot was fired by Easling into the window? A. They were not."

Referring to what occurred at the time Harvey was killed, he testified:

"I could n't say how long it was after Easling fired that shot before Mrs. Harvey appeared in the hall. . . . I told her to take those children back and go back into the house, or some words to that effect. She did that immediately. She was right at her kitchen door and stepped right back into the kitchen. I did not shoot right at that moment. Harvey was standing right there where I could see him. The next thing that occurred was that I asked him to come out and surrender, once or twice. I don't know whether he heard me or not. He made no reply. I think I said: 'Throw up your hands.' I did n't see him if he started to throw up his hands. I never seen his hand if it was up there so as to protect his body from shot. I think his hands were down at his side. I would not swear positively that they were hanging clear down. I am not positive sure where they were; I don't think they were on his breast, either of them."

On his direct examination the witness Milstead testified that when he asked Harvey to come out and surrender,

"he kind of stepped back this way, dropped his hand like he was going into his pocket. I fired the shotgun. I shot at him at that time because I thought my life was in danger; he had been shooting there and I did n't know but what he would shoot again."

On cross-examination he was asked whether or not he had testified at the coroner's inquest that his instructions were to take Harvey dead or alive, and whether he had not answered:

"The marshal told me that if he can't—if he did n't surrender to shoot him."

His answer was:

"Easling told me that, I believe, yes; yes, I will say yes, 'if he did n't surrender.' I could n't say that he also told me to shoot him regardless

Harvey v. City of Bonner Springs.

of whether he resisted or not, I could n't say that he did. I would n't say that he did n't; it has been so long ago."

\ He had known Harvey probably twenty years.

"During that twenty years I had not personally any knowledge of his ever having shot anybody or committed any felony or stolen anybody's property or been a violent, turbulent man."

Webber, who testified for the defense, said that Easling deputized him to guard the house at the rear, and told him what had happened. From one o'clock in the night until daylight he stood guard alone, except for a short time when O'Donnell and the marshal were there. In reference to his instructions he said, "I kind of think he (Easling) told me to shoot if he (Harvey) did n't surrender."

Easling was dead when the trial took place more than two years after these occurrences. The city offered evidence to show that Harvey bore a reputation of being a turbulent, violent, and dangerous man; that in 1901 he had been convicted of larceny in Wyoming and served a term of two years in the penitentiary there.

The plaintiff introduced witnesses in rebuttal as to the character and reputation of Harvey in the neighborhood where he had resided.

There was a justice of the peace in Bonner Springs, but no warrant had been issued for the arrest of Harvey.

The jury made the following special findings:

"1. What persons were about the outside of the City Hall in Bonner Springs on the night of December 17th, 1913, or in the morning of December 18th, 1913, before the death of Harvey? Webber, Easling, Lawrence, Milstead, O'Donnell.

"2. Did such persons leave their homes and assemble at the City Hall upon the call, order or direction of any one? Yes.

"3. If you answer the last question in the affirmative, upon whose call or order did they assemble there? Easling.

"4. At the time in question, was William G. Easling an appointed, qualified and acting deputy sheriff of Wyandotte county, Kansas? Yes.

"5. For what purpose were said persons called or ordered to assemble at said City Hall? To arrest Rolla Harvey.

"6. Did said Harvey on the night of December 17th, 1913, while in the company of one Rhodes, on Cedar street, in the city of Bonner Springs, assault William G. Easling by shooting at him? No.

"7. Was said Harvey armed with a revolver when he first came out upon the porch of the City Hall on the morning of December 18th, 1913? We think he was.

2—102 Kan.

"8. Did said Harvey on the morning of December 18, 1913, when informed that he was under arrest or was called upon by the marshal to surrender and throw up his hands comply with such request? The first time he did not, but the last time he did.

"9. Did said Harvey upon being informed that he was under arrest or throw up his hands by said William G. Easling, hold in his hand or produce a revolver and shoot with the same at said W. G. Easling or the persons with him at the time? The first time we think he did, but the last time he did not.

"10. Did said Harvey shoot at or inflict a wound upon one Webber at said time? We think the bullet that struck Mr. Webber possibly was fired by Harvey."

The contention of defendant that it was error to overrule a demurrer to the evidence is argued upon two grounds; first, that the petition fails to state a cause of action under the statute which imposes upon cities and towns a liability for injuries occasioned by the acts of a mob. There was no demurrer to the petition; besides, it stated a cause of action under the statute when it alleged that a large number of persons congregated and assembled at and around the house of the plaintiff and her husband within the limits of the city; that while her husband was coming out of his house at their direction and request, the assemblage of persons unlawfully assaulted him with shotguns and revolvers and caused his death. The second ground upon which it is urged the demurrer was well taken is, that there was no evidence to sustain such a cause of action when plaintiff rested her case. If the petition stated a cause of action under the statute, the evidence was sufficient as against a demurrer, because it tended to prove just what the plaintiff alleged in her petition.

The main contention is that the court erred in not directing a verdict for the defendant. The defendant invokes the well-known rule that where an officer has legal authority to make an arrest, and is using proper means, he may repel force with force; and if the person resisting is necessarily killed in the struggle, the homicide is justified, and a corollary to the same rule to the effect that "duly summoned assistants of an officer are under the same protection of the law that is afforded to the officer who has process in his hands." Many authorities are cited in the brief, holding that where an officer making an arrest for a felony is forcibly resisted he is not limited to such force as is necessary to protect himself from death or great

Harvey v. City of Bonner Springs.

bodily harm, but may stand his ground and use such force as is necessary, or apparently necessary, to overcome the resistance offered, even to the extent of taking life.

Other authorities relied upon state the rule as to the power and the rights of an officer in arresting a person who is committing a public offense in his presence, or where a felony has been committed, and the officer has in his possession a warrant for the arrest. The officer in the present case had no warrant, and the jury has found that no felony was committed. There was some conflict in the evidence, but in our opinion there was abundant—perhaps a preponderance—to sustain the finding in favor of the plaintiff, that all that Harvey was guilty of the night before his death was in assaulting the city marshal and knocking him down; and that the only revolver shots on that occasion were fired by the officer himself.

We think it was a question of fact for the jury to determine whether the crowd of men around Harvey's house that morning were acting in good faith in attempting to make his arrest, and killed him in the honest belief that it was necessary to kill or disable him; or on the other hand, as the plaintiff claimed, they formed, during the time of the assemblage, the purpose and intent to take his life, and that in carrying out that purpose he was killed. The court stated the law fairly on these propositions and gave admirable instructions. The jury were told that the burden of proof rested upon the plaintiff to establish that her husband met his death at the hands of a mob; and unless the jury believed from the preponderance of the evidence that her husband was so killed, no recovery could be had against the defendant; and that if the jury believed from a preponderance of all the evidence that the assemblage about his home was without authority of law, but for the purpose and with the intent on their part of doing violence to or injuring plaintiff's husband, or that after having assembled for the purpose, whether lawful or otherwise, they thereafter formed the unlawful purpose of injuring the said Rolla Harvey, and while so assembled they did, or any of them did, inflict injury upon him from which his death resulted, they should find for the plaintiff.

The court charged that the fact that a number of members of a lawfully assembled posse in attempting to effect an arrest

might act too hastily, or unnecessarily kill a person sought to be arrested within the limits of the city, would not render the city liable for the death; in order that a liability may arise, the posse, after having lawfully assembled, must have abandoned and lost its character as such, and must have become a mob. They were charged that if they found from the evidence that Easling was a deputy sheriff, or city marshal, and that Harvey attempted to shoot him without other provocation than being accosted in the nighttime with an inquiry as to his presence on the street at that time of night, or words to that effect, Harvey was guilty of a felony, and that Easling had the right to arrest him without a warrant, and to call on any citizen or citizens of the county to assist him in making such arrest; and that it was the duty of any citizen or citizens to obey the call and to act under the orders and directions of Easling; and that while so acting they were clothed with the same duties, responsibilities and protection as Easling, and the defendant would not be liable for their acts.

The court also charged that in the face of a resistance, an officer attempting to arrest one who has committed a felony is not required to fall back, but on the contrary is justified and encouraged to press forward and vindicate the law by effecting the arrest or apprehension of the person. In another instruction the jury were told that if they believed from the evidence that the persons present at the time Harvey was killed were there in pursuance of the call of a deputy sheriff for assistance, the presence of citizens so assembled would not constitute a mob as defined by the statute, and that the defendant would not be liable for the acts of such citizens in attempting to arrest or apprehend Harvey,

"even though you should find that the acts of said citizens or any of them were not excusable on the ground of self-defense, or apparent necessity, as hereinbefore explained, and your verdict should be for the defendant, unless you find that after having lawfully assembled, an unlawful intent and purpose was formed, and a mob constituted as hereinbefore defined."

These instructions state the law contended for by the defendant with respect to the rights of an officer making an arrest without process where a felony has been committed, and the protection afforded by the law to those whom such officer has

called to his assistance. As already observed, the jury find that no felony had been committed by Rolla Harvey. They may have believed that he was guilty of a misdemeanor or the violation of a city ordinance. Under the instructions of the court and facts which the jury believed were shown by a preponderance of the evidence, they may have found that the assemblage was lawful at first, and that afterwards those assembled united in an unlawful purpose to injure or take the life of Harvey, unless he surrendered. If these facts were true, no member of the assemblage could invoke the rule that he was protected by reason of the lawful purpose for which the assemblage was first formed; nor could the city rely for a defense upon the fact that the assemblage in its original purpose was lawful.

The statute defines a "mob" as "any collection of individuals assembled for an unlawful purpose, intending to injure any person by violence, and without authority of law" (Gen. Stat. 1915, § 3727), and the statute which provides for the punishment of persons participating in unlawful assemblages (Gen. Stat. 1915, § 3674) defines an unlawful assemblage as "three or more persons" who "assemble together with intent to do any unlawful act with force and violence against the person or property of another, or to do any unlawful act against the peace."

In the quite recent case of *Blakeman v. City of Wichita*, 93 Kan. 444, 144 Pac. 816, it was held that under these statutes it is immaterial what the primary purpose was for which the persons assembled, "if they in fact formed and executed the unlawful purpose after they were brought together." (Syl. ¶ 2.) In that case the city was held liable for the acts of a mob, comprised wholly of persons confined in the city prison, who unlawfully assembled and acted together in assaulting a fellow prisoner in the jail. The opinion quotes from *City of Madisonville v. Bishop*, 113 Ky. 106, 109, the following language:

"The purpose of the assembly, or the aim that it had primarily in view, is not material, if it was in fact riotous or tumultuous, and the city authorities had notice of it and ability to prevent the damage it did." (p. 448.)

The courts have always been jealous, and rightly so, of any attempt to limit unduly the exercise in good faith of the power

and rights the law has conferred upon an officer of the peace in the discharge of his duties; but peace officers, like all other officers, are subject to human frailties and passions; so long as they act with proper motives in seeking to arrest a person charged with an offense, the law protects them and those summoned to assist, even though, acting hastily or upon mistaken judgment, they unnecessarily take the life of the person charged. The fact, however, that the assemblage acts under the color of authority as a posse summoned by an officer will not necessarily and of itself furnish a defense to a city in an action under the statute.

This court cannot declare as a matter of law that the assemblage in the present case was not a mob within the meaning of the statute, because the motive which actuated the assemblage, not only at the time it was assembled, but also until the death of plaintiff's husband was brought about, was a question of fact; and if on this vital issue reasonable minds might draw different conclusions from the evidence, we are bound by the verdict of the jury. It certainly cannot be said that the statute affords no redress in a situation which conceivably might happen, where a deputy sheriff or city marshal, or an assistant city marshal, called together a posse to assist him in making an arrest for a misdemeanor, intending under the guise of such a call to take, and did take, the life of the person charged, on the pretense that he was resisting arrest, or that they or some of them were in danger of being assaulted by him. In some of the large cities of our own country men have been known to conspire with officers to bring about the death of a person whom they desired to get rid of, and, in carrying out such unlawful purpose, to employ the pretense that the person was killed while resisting an arrest. In the bandit wars in Mexico, and, if some of the stories which are told of the present world war are true, it sometimes happens in other countries that prisoners of war have been shot under the specious pretense that **they were attempting to escape.**

There is some complaint in reference to the rejection of testimony. The court properly limited the cross-examination of plaintiff to matters connected with her testimony in chief. Some of the testimony rejected was hearsay. Besides, none of the evidence concerning which complaint is made was brought

to the court's attention on the hearing of the motion for a new trial. The instructions given, as already observed, presented fairly the issues raised by the defense.

Because of plaintiff's neglect to present a verified claim against the city, it is conceded that she was not entitled to judgment for costs. She should have offered in the lower court to release the judgment for costs before the appeal was taken, and we think it is proper that one-half the costs in this court should be taxed to plaintiff.

The judgment, except as to costs in the court below, is affirmed.

JOHNSTON, C. J., MARSHALL and DAWSON, JJ., dissent.