No. 22,439.

F. F. MOORE, *Appellee*, v. THE CITY OF WICHITA, *Appellant*.

SYLLABUS BY THE COURT.

1. MOB VIOLENCE—*Illegal Search of Private House—Qualifications of Jurors.* The theory that a juror's mind must be like a sheet of blank paper is no longer followed.

2. SAME. Overruling a challenge to a certain juror and limiting counsel in his examination as to competency, held proper.

3. SAME—*Definition of Mob.* Instead of using the dictionary definition of a mob, the court gave the jury the statute concerning the liability of cities for the action of mobs therein. *Held*, sufficient.

4. SAME. The ancient common-law maxim followed, that a man's house is his castle.

5. SAME—*Unverified Claim against City—Costs.* The claim filed for the damages sought to be recovered was not verified. *Held*, that this did not preclude recovery of costs under the statute. (Gen. Stat. 1915, § 1406.)

Appeal from Sedgwick district court, division No. 1;
RICHARD E. BIRD, judge. Opinion filed April 10, 1920. Af-
firmed.

*Robert C. Foulston, A. M. Ebright,* and *George Seifkin,* all of
Wichita, for the appellant.

*S. B. Amidon, D. M. Dale, S. A. Buckland, H. W. Hart,* and
*Glenn Porter,* all of Wichita, for the appellee.

Moore v. City of Wichita.

The opinion of the court was delivered by

WEST, J.: The city of Wichita appeals from a judgment in favor of the plaintiff on account of damages inflicted by an alleged mob.

The amended petition alleged in substance that four men assembled themselves together for the purpose of defying the law and committing violence against the plaintiff and his family, and did, at or about the hour of eleven o'clock, p. m., surround his home and with force and violence break down the rear doors, the locks, hinges and fastenings thereon, and enter the home and assault the plaintiff; that his wife and daughter were in bed at the time; that these four men went into their rooms and by force and violence compelled them to get out of bed, and with force and violence went through the house, ransacked closets, drawers and cabinets and continued in such unlawful conduct until assistance was called for; that in assaulting the plaintiff they wrenched and bruised both his arms, his legs and his chest, and that he suffered great pain as a result thereof; that his wife received a severe nervous shock, and being ill at the time, suffered a nervous breakdown rendering her unable to attend to her household duties, and causing a doctor's bill of two hundred fifty dollars; and that the damages to the house amounted to six dollars.

The defendant answered denying any unlawful assembly, and pleaded that these men were officers and acted as such pursuant to a search warrant in their possession duly issued by the police judge.

The plaintiff testified in substance that he owned his home where he had lived for nine years; that he was working as a blacksmith for the Ford Motor Company; that on the day of the injury complained of he reached home about six o'clock, and about eleven o'clock at night, hearing a noise at the door, he asked what was wanted, and some one answered, "This is Stuckey," and said he wanted some whisky, to which the plaintiff replied, "This is no joint." This person then went away a short distance when some one came out of the weeds and the two started back towards the house. The plaintiff got a shotgun, and went to the door to see what was wanted and, upon inquiring, was told, "We want whisky."

"I says, 'There is no whisky here,' and I stepped outside, and the four of them jumped and grabbed me, one of them kicking me, and the other hit me on the head with his gun, and another says, 'Shoot him.' I broke loose from them, and rushed back into the house and locked the door, and told my daughter. . . . They kicked me on the leg, and one of them hit me on the head with his gun."

His daughter started to call the police, when all four of them broke the door down and came in.

"When they broke the door down, then they says, 'You don't need to telephone the police officers; we are the police.' I says, 'Show me your warrant.' 'We haven't any.' I says, 'Show me your authority.' 'I will not do it. I don't have to.' I says, 'This is my house; you do have to. I have a right to protect my wife and daughter.'"

Showing no authority, they said:

" 'We want to search the house,' and one of them went into the pantry and searched around; one searched my wife's cupboard, and bursted my daughter's trunk and searched around there. . . . My wife and daughter were in their night clothes. . . . My wife tried to keep them—and she said, 'Wait a minute.' They were tearing the stuff out, and they said, 'Get away from here and attend to your own damned business.'"

They all went out by the side of the house, and one of them said:

"You fellows have made a serious mistake."

Mrs. Moore testified, among other things, that when the men had finally broken in, her daughter, who was a telephone girl, called the police—

"Well, she was telephoning and told them to hurry quick; she says, they are breaking in right now. Just then our door fell and four men flew into the room, and the bunch of them almost fell to the floor, they came in so quick."

After describing how they searched through her things, she said her daughter had a trunk of freshly laundered clothes, and when the witness offered to take these things out one of the men shoved her away and said: " 'Go on out and attend to your own business.' And cursed besides."

The daughter, after telling of the assault upon her father and the taking of the gun from him, and how she telephoned for the police, was asked how they broke in—

"They kept hammering on the door and hollering to let them in, and they broke the door in . . .

"Q. When they were breaking the door in what were you doing?

A. Calling the police station. . . . I just told them there were burglars, they were breaking in now, come quick.

"Q. Did you know at the time that you were talking to them, that they claimed to be officers?   A. No, sir.

"Q. Had they said anything about being officers?   A. No, sir.

"Q. Well, what happened after you said they were breaking in right now, come quick.   A. When they got in, they screeched at me and said, 'You don't need to call the police station; we are officers.' "

The defendant requested the court to instruct, among other things, that the term "mob," as used in the statute under which this action was brought, means a collection of three or more persons assembled together for an unlawful purpose and intent, to do any unlawful act with force and violence against the person or property of another, and that before the plaintiff could recover he must prove that his injury, if any, resulted from the action of a mob thus defined.   This was refused, but the statutory definition of a mob was given and a charge to the effect that if the persons charged with injuring the plaintiff were police officers of the city and acting under a warrant issued by the police judge, which warrant at the time described the property, the jury must find for the defendant, but if the jury should find that the persons constituted a mob and were not acting under a warrant, or that such warrant did not describe the premises, the plaintiff was entitled to recovery if injured in person or property; that if the officers of the city were acting under a warrant they had a right to enter the premises and search them; also, that the law imposes a privilege and duty upon a person to protect his own home, and, if the police officers of the city were not acting under authority of a warrant, the plaintiff was justified in protecting his home, even in taking the life of persons who might unlawfully endeavor to break into it.   One instruction declared:

"The law holds that a man's home is inviolate; that a man may protect his family and his home even to the extent of taking life, if such becomes necessary."

The jury returned a verdict for the plaintiff for two thousand dollars, but the court gave him the option of remitting all but five hundred dollars or submitting to a new trial.   Such remittitur was accepted and judgment rendered for five hundred dollars.

Error is assigned on overruling the defendant's challenge

to a juror, in restricting counsel in his questions on the *voir dire* examination, on giving and refusing instructions, and on denying a new trial.

One juror said that he had an opinion on the case founded on newspaper articles which he had read; that he had not talked with any one who knew anything about the facts; and that he would be governed by the evidence. He was asked if he put enough confidence in market reports and current events to conduct his business upon that as a basis, to which question an objection was sustained. He was asked if in daily activities he took the things he saw as facts, more or less. He said: More or less, but did not always rely on newspaper reports as being true; that he had an opinion, unless changed by evidence; and that it would take some evidence to change it, but that as soon as evidence should be introduced this newspaper opinion would disappear; and that he felt he could freely render a verdict upon the evidence as submitted.

The old theory that a juror's mind must be like a piece of blank paper has happily gone into ancient history. It is clear that what this juror had was a mere newspaper impression, and not a fixed opinion, and he could not have helped the situation by telling the extent to which he relied in everyday business upon newspaper reports.

Fault is found with an instruction that if there was a mob as defined by the statute it was no defense, that a part of it was composed of police officers acting unlawfully or in conjunction with a mob, as unduly emphasizing the plaintiff's contention that the officers became a mob because they failed to disclose that they were officers or to produce a warrant. As no excuse appears for their failure and repeated refusal to show any authority for their invasion of the plaintiff's home, this instruction was entirely proper.

The same fault is found and the same conclusion reached touching another instruction, to the effect that when an arrest is made by any other than a known peace officer he must disclose his authority when requested so to do.

It is said that, assuming the court's instruction regarding a man's right to protect his home and family and the plaintiff's right to resist police officers if not acting under the authority of a warrant to be a correct statement of the law, it was not ap-

Moore v. City of Wichita.

plicable, the vital question being whether or not there was a mob in fact. So long as it is not asserted that this instruction was inherently incorrect or that it worked any harm, it cannot be deemed to have been erroneously given.

Much fault is found that the court did not give the dictionary definition of "mob," which Bouvier says is—

"A tumultuous rout or rabble; a crowd excited to some violent or unlawful act."

and Webster—

"The, or a, disorderly element of the populace; the rabble; a riotous assembly; a disorderly crowd;   . . ."

But the statutory definition which was given is—

"That any collection of individuals assembled for an unlawful purpose, intending to injure any person by violence, and without authority of law shall for the purpose of this act be regarded as a 'mob.'   . . ." (Gen. Stat. 1915, § 3727.)

The act also provides, and the jury were instructed, that—

"If three or more persons shall assemble together with intent to do any unlawful act with force and violence against the person or property of another, or to do any unlawful act against the peace, or being lawfully assembled, shall agree with each other to do any unlawful act aforesaid, shall make any movement or preparation therefor, the person so offending on conviction thereof shall be fined in the sum not exceeding two hundred dollars." (Id., § 3674.)

These were sufficient.

Counsel say that if the police officers failed to disclose their official capacity or produce a warrant it did not make them any less officers or render the city liable for their nonfeasance. Naturally, it was essential for the city to demonstrate that these officers did not constitute a mob, for if they did, the city is liable under the statute for their unlawful conduct. While it is forcibly argued that the plaintiff seeks to construe them into a mob for damage-suit purposes, the difficulty is that some plain-clothes men who may have had authority to act in an orderly way saw fit to act exactly like a mob, even when requested to exhibit their authority.

One of the maxims most deeply embedded in the hearts of English-speaking people is the one quoted by all, and familiar even to school children, that, "A man's house is his castle." The Roman definition of a home was a place—

"Where a man hath his hearth, his household gods and the sum of his possessions. . . . whither having wandered, he longs to return, and whence having returned he ceases to wander."

It was comparatively but a short time after the passing of the dark ages and the dawning of the Renaissance that Coke coined this apt phrase as a statement of a primary principle of the common law. He said:

"For a man's house is his castle, for where shall a man be safe if it be not in his house." (Coke upon Littleton, 3d Inst., 4th ed., 162.)

This was published in 1669.

In Semayne's case, 3 Coke's Reports, 188, it was resolved that—

"The house of every one is his castle, and if thieves come to a man's house to rob or murder, and the owner or his servants kill any of the thieves in defense of himself and his house, it is no felony and he shall lose nothing." (Syl. ¶ 1.)

It was resolved that—

"In all cases where the King is party, the sheriff may break the house, either to arrest or to do other execution of the King's process, if he cannot otherwise enter. But he ought first to signify the cause of his coming, and make request to open the doors." (Syl. ¶ 3.)

In Bettisworth's Case, 1 Cope's Reports, 516, it was said:

"Thirdly, peradventure the lessee durst not for fear of force, etc., be upon the land to preserve his possession, but his house is his castle, which he may by law safely keep, and therefore the case of the house is the stronger." (p. 517.)

In Bowles's Case, 6 Coke's Reports, 149, it was said:

"The house of a man has privilege to protect him against arrest by virtue of process of law at the suit of a subject, . . . It has privilege against the King's prerogative, for it was resolved by all the Judges, . . . that those who dig for saltpetre shall not dig in the mansion-house of any subject without his assent; for then he, or his wife or children, cannot be in safety in the night, nor his goods in his house preserved from thieves and other misdoers. . . . If a man is in his house, and hears that others will come to his house to beat him, he may call together his friends, etc., into the house to aid him in safety of his person for, as it has been said, a man's house is his castle and his defense, and where he properly ought to remain." (p. 155.)

One writer clothes the maxim in these words:

"To every one, his house is his surest refuge; . . ."
(Wharton's legal Maxims, p. 77. Maxim XXI.)

Blackstone, in his delightful style, says:

"Burglary, or nocturnal housebreaking, . . . which, by our ancient law, was called *hamesecken*, as it is in Scotland to this day, has always been looked upon as a very heinous offense; not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation which every individual might acquire even in a state of nature; an invasion, which, in such a state, would be sure to be punished with death, unless the assailant were the stronger. But in civil society the laws also come in to the assistance of the weaker party; and, besides that they leave him this natural right of killing the aggressor, if he can (as was shown in a former chapter), they also protect and avenge him, in case the might of the assailant is too powerful. And the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity." (4 Wendell's Blackstone's Commentaries, 222.)

The fame of the elder Pitt as an orator rests to quite an extent upon his eloquent parliamentary attack in 1764 on the question of general warrants. He said that a search and seizure of papers without a specific charge alleged would be repugnant to every principle of liberty. The most innocent man could not be secured.

"But by the British constitution, . . . every man's house is his castle. Not that it is surrounded with walls and battlements. It may be a straw-built shed. Every wind of heaven may whistle round it. All the elements of nature may enter in. But the king cannot; the king dare not." (12 Biographical Dictionary 257.)

The court in its instructions did not invest the plaintiff's house and home with more sacredness from unlawful entry than the law accords to it.

We must not remove the ancient landmarks of common-law liberty, or weary of the presumptions accorded those suspected or accused of crime, or become impatient with the muniments of title which have for centuries made us feel secure in the possession of our Anglo-Saxon freedom. The human tendency to exalt and expand a little brief authority may sometimes be excusable, but it can never form a justification for refusal at the expense of settled principles of liberty to make its possession known when properly called upon to do so.

The undisputed testimony is to the effect that the plaintiff is a law-abiding citizen, and to invade his house and treat him and his wife and daughter the way they did, the men com-

posing this mob in fact and in law brought the defendant city within the plain operation of the statute invoked. On what principle the defendant was relieved of three-fourths of the liability found by the jury we do not know, but gauging the size of the verdict by the evidence we have no hesitancy in saying that there was no symptom of passion or prejudice.

The city argues that it should not be taxed with the costs for the reason that no claim was filed within the time and manner required by the statute, but before the time fixed by the statute had expired a claim was filed and presented, although this had not been done when the action was begun. The only trouble with it is the lack of verification. The statute prohibits the audit or allowance of such a claim unless verified, but only prohibits recovery of costs when the "claim . . . has not been presented to the city council to be audited, . . ." (Gen. Stat. 1915, § 1406.) It can hardly be said that this claim was not presented for audit and allowance, notwithstanding the failure of the claimant to add a verification. As to recovery of costs, the presentation rather than the verification is the essential prerequisite.

No error, therefore, arose in adjudging the city liable for costs.

The judgment is affirmed.

JOHNSTON, C. J., dissents.

MARSHALL, J. (dissenting). I do not agree that the police officers of Wichita acting under the authority of a warrant constituted a mob as defined by the statutes of this state. That they acted wrongfully and are liable for their acts is without question, but that they constituted a mob under sections 3727 and 3822 of the General Statutes of 1915, in my judgment, cannot be established by sound reasoning.