No. 27,018.

SAM O. HENDREN, *Appellee*, v. CITY OF ARKANSAS CITY, *Appellant*.

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS — *Liability for Injuries from Mob.* In an action against a city for injuries sustained at the hands of a mob, the record examined, and held that the city's demurrer to plaintiff's evidence was properly overruled.

2. SAME — *Acts Constituting Violation of Mob Act.* Where a large number of men and boys of a city started good-humoredly and without evil intent to have some fun with plaintiff, a simple person, who held diverting delusions about his talents, but where, after they assembled, five or more of their number then determined to harass, annoy and humiliate him, and in doing so, in a violent and turbulent manner, did injure the plaintiff, an instruction that, if such facts were established, the city would be liable in damages to plaintiff under the provisions of the mob statute (R..S. 12-201) was a correct statement of the pertinent law.

3. SAME — *Liability for Injuries from Mob — Mental Pain and Suffering as Element of Damages.* An instruction was not erroneous which told the jury that if plaintiff's physical injuries sustained at the hands of a mob were attended with mental pain and suffering, such pain and suffering might be considered as an element of plaintiff's recoverable damages.

4. SAME—*Evidence.* Under the evidence adduced in plaintiff's behalf, the verdict and judgment for $1,000 was justified.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed January 8, 1827. Affirmed.

*S. C. Bloss,* of Winfield, and *Tom Pringle,* of Arkansas City, for the appellant.

*W. L. Cunningham* and *D. Arthur Walker,* both of Arkansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.:  This was an action against the defendant city for damages sustained by plaintiff through the action of a mob.

Plaintiff, an admitted simpleton, resides in Arkansas City. For some time prior to the doings involved herein he indulged the fancy that he had histrionic attainments of such high order that some imaginary motion-picture companies were competing for his services, and that one of these planned to waylay and kidnap him. This

Damages, 17 C. J. p. 1075 n. 99.  Municipal Corporations, 28 Cyc. pp. 1296 n. 53, 1465 n. 36, 1515 n. 99, 1527 n. 86; 10 L. R. A. n. s. 925; 44 L. R. A. n. s. 359; L. R. A. 1918C 239; 13 A. L. R. 751; 23 A. L. R. 297; 44 A. L. R. 1137; 19 R. C. L. 1104.

delusion quite naturally attracted the attention of several young men and boys of the town, and on the evening of May 8, 1925, some thirty or thirty-five of them escorted him to one of the city parks on the pretense of hunting these imaginary kidnappers. Then followed some running and playing and beating of shrubbery in the park, but eventually the play became too rough and plaintiff was knocked down and severely and variously injured. There was considerable testimony which tended to show that the plaintiff's injuries were not the result of a mere accident growing out of innocent and thoughtless playing on the part of the young men and boys, but that some sort of concerted plan existed on their part to get plaintiff down to the park and take unjustifiable liberties with him. Plaintiff testified that he was surrounded by "the gang" who crowded him, and "headed him off" from the direction he wanted to go, which was towards the main part of the city, and eventually they "wound up at Paris Park."

Plaintiff's testimony, abstracted, in part, reads:

"The mob was composed of more than twenty-five or thirty in a gang at this time and there were probably three or four boys, but most of them were men—grown men. They threw him down and tried to hold him and gagged him when down. . . .

"Q. During this affair or assault had one of them hit you? A. Not then.

"Q. Did you know what the mob was trying to do at all? A. Still trying to get hold of me; then finally one of them hit me on the mouth with a hard instrument, cannot say what it was, but it was hard, and I fell down, and when I fell I hit this way (indicating). I fell on my arm and pulled it out of place.

"When witness fell he was knocked down. One man was hold of his legs, holding them tight together. Witness unable to run. Two or three teeth were knocked loose. Mouth was cut and he was spitting blood; left arm was injured by being thrown out of place at the elbow. About twenty-five men were present. After he was knocked down there was a man drove up in his car and asked them what they were doing, and the mob left. Witness was taken uptown, a physician was called and Doctor Day set his arm. . . . It was discolored, black and blue. It was swollen about twice its normal size. His clothing was badly torn up, trousers and shirt nearly torn off, hat ruined. His arm was fixed in a sling."

One witness, a boy who joined the crowd about plaintiff, testified:

"I first saw Sam [plaintiff] south of the high school on Washington avenue. . . . I should judge there was around thirty in the crowd. . . . Sam was the center of attraction. I thought something would happen. I didn't know what they were going to do. I went down to find out what they were going to do to Sam. . . . I saw him climb in the car after he got hurt. . . .

"BY THE COURT:   . . .

"Q. How did you get it into your head that they were going to have some fun—play a joke on this man? A. I don't know how I got it into my head."

Another witness called by defendant testified:

"A. Well, Sam was all fixed up: I didn't know it was him. He was all fixed up with a mustache and everything else. . . . Had an old hat and a big pair of glasses. . . . I found out it was Sam in about ten seconds after I had been with them. At the park he wasn't running as if he was running away from anybody, he was running as if trying to catch somebody. He thought another moving-picture company was trying to catch him and run off with him because they didn't want to pay him so much money as another company did. He didn't want to be kidnapped. I saw him at the time he was injured. I was within ten feet of him. He fell. I did not see any one push him or hit him or assault him in any way. I wouldn't say they didn't, but I didn't see them. The only thing he complained of was that his arm was hurt. . . . I joined the crowd to see what it was. I wondered what was going to happen. I thought probably there would be a joke. I didn't do anything to protect Sam."

Another of defendant's witnesses testified:

"I remember the evening Sam Hendren was injured. . . . There were some young men with him, eight or ten . . . I went along, expecting we were going to have some fun with him . . . There was something like twenty-five or thirty in the crowd. I can't say where the rest came from— must have come out of some of the school buildings. . . . I didn't know what they were going to do. I saw them kinda playing with him. He was running and I left. I left because it was time for me to go home."

The chief of police testified in behalf of the defendant city, but on cross-examination admitted that the rough usage which plaintiff suffered on this particular night, May 8, 1925, was not the first incident of its kind. On a former occasion "a lot of boys got a rope and made believe that they were going to hang him." Yet another witness testified that a year previous to the incident involved in this action, she had talked to the mayor and city officials protesting against the way this plaintiff was being treated in Arkansas City.

Jury trial; verdict for $1,000 in favor of plaintiff, and judgment accordingly; appeal.

Under the errors assigned, it is first urged that the demurrer to plaintiff's evidence should have been sustained. Counsel for the city concede that there was a large crowd of men and boys near the plaintiff when he was injured, but insist no evidence tending to show that the statutory minimum of five people (R. S. 12-201) were concerned in any injury plaintiff sustained. The court holds that the excerpts from the record which we have quoted above are sufficient

to show that it was a fair jury question whether as many as five of the crowd of thirty-five men and boys participated in any manner or in any degree in the acts which culminated in the assault upon and injury of the plaintiff.

Defendant assigns error on the instruction of the trial court which declared that although the men and boys started out good-humoredly, and with perfect good nature, and without intending any harm to the plaintiff, yet after they assembled if five or more of their number then determined to harass, annoy and humiliate him, and, in doing so, in a violent and turbulent manner, did injure the plaintiff, the city would be liable. Such an instruction was a very favorable statement of the pertinent law so far as concerned the defendant, and well fortified by the rule announced in *Cherryvale v. Hawman,* 80 Kan. 170, 173, 101 Pac. 994, where a crowd of roisterers undertook to have some fun at the expense of a bride and groom, and in the course of which a small boy had his leg broken. Under the mob statute the city was subjected to damages in behalf of the boy and his mother. In affirming the judgment this court held:

"Where the members of a charivari party forcibly place a bride and groom in a wagon against their will, and draw them up and down the streets, they are engaged in an act of unlawful violence within the meaning of such definition. The fact that they are good-natured and intend no serious harm to any one does not absolve the corporation from liability." (Syl. ¶ 2.)

Defendant also assigns error in an instruction which told the jury that they might take into consideration the plaintiff's mental pain and suffering and the extent of his injuries, if any, whether permanent or temporary, in determining the amount of their verdict. It is argued that the statute does not include such elements of damage, but is limited to damage to property or injury to life or limb. Mental pain and suffering is, or at least may be, an injury to life, and while a simulated but groundless claim of mental pain and suffering is so easy to make and hard to disprove, or to measure in damages if genuine, that the law will seldom permit an award therefor apart from a related physical injury (*Ramey v. Telegraph Co.,* 94 Kan. 196, and citations, 146 Pac. 421), yet where, as here, there was ample proof of objective physical injuries to plaintiff, there was no error of law in the criticized instruction. (*Scott v. Cowen,* 114 Kan. 32, and citations, 217 Pac. 698.) Furthermore, it is rather clear that the jury made no allowance to plaintiff for mental pain and suffering.

It is finally urged that the verdict and judgment for $1,000 is not supported by the evidence. But according to some of the evidence, plaintiff came out of the tumult with two or three teeth knocked out, lips bruised, bloody, and filled with sand and dirt, his left arm out of joint and a piece of bone broken off the side of the radius bone of his left arm; and he suffered severe pain for about two weeks, and had to carry his injured arm in a sling for a month. Later it was only with pain and inconvenience that he was able to use his arm, and even then he could not use it for rough outdoor labor such as he was able to do before his injury. This court perceives no shortage of evidence to justify the verdict and judgment; nor does the record disclose anything approaching reversible error or miscarriage of justice in this case.

The judgment is affirmed.