### No. 27,315.

MARY KOSKA, *Appellee,* v. THE CITY OF KANSAS CITY, *Appellant.*

#### SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS — *Liability Under Mob Act — Nature of Word "Mob."* The word "mob" as used in R. S. 12-201, creating a civil liability on cities for damages resulting from the action of mobs, is not strictly a legal term, but is a vernacular word descriptive of a large and aggravated riot, and is practically synonymous with riot.

2. SAME—*Liability Under Mob Act—"Mob" Defined.* In defining the word "mobs" as used in R. S. 12-201 it is inaccurate to consider it as synonymous with "unlawful assemblages" as that term is defined in R. S. 21-1001, or to confuse it with the definition of "mob" given in R. S. 21-1003.

3. SAME—*Liability Under Mob Act—Crimes Generally.* The civil liability imposed on cities by R. S. 12-201 for damages that accrue in consequence of the action of mobs does not include damages for crimes generally.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed April 9, 1927. Reversed.

*William Drennan, Willard M. Benton, Joseph A. Lynch* and *A. B. McWilliams,* all of Kansas City, for the appellant.

*J. H. Brady* and *T. F. Railsback,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages under the mob statute. The principal question presented, and the only one we need to discuss, is whether the petition and opening statement on behalf of plaintiff set forth facts sufficient to state a cause of action under the statute. The portion of the petition material to be considered reads as follows:

Mob, 40 C. J. pp. 1231 n. 82, 1232 n. 89 *et seq.* Municipal Corporations, 28 Cyc. p. 1296 n. 54; 10 L. R. A. n. s. 925; 13 A. L. R. 751; 23 A. L. R. 297; 44 A. L. R. 1137; 19 R. C. L. 1104. Pleading, 31 Cyc. p. 65 n. 42 new. Unlawful Assembly, 39 Cyc. pp. 831 n. 1, 835 n. 24, 25.

"That on or about the third day of June at about the hour of two o'clock a. m., plaintiff with her minor children was sleeping on the floor of her home. At about said hour, a mob consisting of four men entered said house, breaking in the front door, for the purpose of doing this plaintiff bodily harm, and to assault and intimidate her. Plaintiff states that after forcing their entrance as aforesaid, said mob ransacked her house, opened the drawers in the cabinets, broke open a trunk which was at the time locked, and took therefrom a sum of money, which this plaintiff states approximates sixty-five dollars. Plaintiff attempted to grab said money from the man holding it, and he struck her with his fist. Thereupon all four men attacked plaintiff, kicking her, striking her with their fists, tearing off her clothes, exposing her entire person to the jests of the mob and striking her on the head with a gun. Plaintiff called for help, and upon the approach of aid three of the members of said mob ran from the house, the fourth member being captured and arrested by the police of the defendant."

### The material portion of the opening statement is as follows:

"May it please the court and gentlemen of the jury: The evidence on behalf of the plaintiff in this case will show and prove substantially the following state of facts: That Mary Koska, the plaintiff, who spells her name K-o-s-k-a, is married and the wife of Steve Koska. That they now live, and did live in June, 1921, at 750 Simpson avenue in this city. That next door to Steve and Mary Koska was another family by the name of Kaska, who spelled their names K-a-s-k-a, or something different from these, at 752, I think is their number. The evidence will show that at this other house was sold liquor, and people were accustomed to frequent for the purpose of drinking liquor and gambling, next door to these people. That these folks here, the plaintiff in this case, came to this country about fifteen years ago; that her husband is now and has been during the time he was here, or practically all the time, employed at one of the railroads. That in June, 1921, I think the morning of the third of June, about two o'clock in the morning, four men—no, the morning of June, 1921, as was the custom of Steve Koska who worked nights, he was away at the Frisco yards, working at the Frisco at night, as was his custom, and perhaps for some months or years. That in the house on this night was Mary, his wife, their four children. That her brother, who stays with her, was out in the yard, sleeping, or in another room. I think out in the yard. That on this morning in question, four men came to the door, the outside door both in the back and front being open and screened in only, and knocked and asked to get in to see the husband, as they put it—Mr. Koska—to see somebody in there. The plaintiff in this case informed them that he was not at home, that he was working at the Frisco yards, and these men broke open the screen door and went into that house. The four children, or some of the children, were lying on the floor on a pallet, or quilts and bedding in front of the screen. These men hung around in the house, and stepped on the children and the like. Now, after these four men, constituting this mob, after entering the house, ransacked the house, opening drawers and cabinets, broke open a trunk that was at the time locked, and took therefrom certain valuables and money.

That the plaintiff attempted to grapple with them, and they struck her with their fists, and the various men knocked her down, and having been knocked down she was by them kicked. That her clothes were torn. At the time she was in her night robe only. That one of the men struck her on the head with a gun. That she called for help, and upon the approach 'of aid three of the robbers ran from the house, the fourth being held by the brother until the officers arrived."

The statute relied upon by plaintiff reads as follows:

"All incorporated cities and towns shall be liable for all damages that may accrue in consequence of the action of mobs within their corporate limits, whether such damages shall be loss of property or injury to life or limb." (Gen. Stat. 1915, § 3822. For amended statute see R. S. 12-201.)

This statute was first enacted by the territorial legislature of 1858 (Laws 1858, ch. 25), and was embodied in the Compiled Laws of 1862 (ch. 77). Perhaps its enactment was brought about because of the turbulent conditions existing, and which existed for a few years, in the territory. In his message to the legislature of 1858, J. W. Denver, secretary and acting governor, calls attention to the bitter feeling and animosity existing at various places in the territory and of reported organized bands whose "members are bound by the most solemn oaths and obligations to resist the laws, take the lives of their fellow citizens, or commit any other act of violence," and to the fact that he had been compelled to send United States troops into at least one neighborhood to restore peace to the community. He urged the passage of laws to quiet the unrest, quell the disturbances and for the punishment of those guilty of offenses. The statute at that time had no provision for mitigating damages. It was amended in 1866 (Laws 1866, ch. 46), by adding a proviso as to what may be shown in mitigation of damages. The statute was reënacted in 1868 (Gen. Stat. 1868, ch. 32) by two sections; the first creating liability substantially the same as the prior statute, and the second providing what may be shown in mitigation of damages. The statute as so enacted remained unchanged until 1923, when both sections were amended (Laws 1923, ch. 79), as they are set forth in R. S. 12-201, 12-202.

It may be noted that the various amendments made to the statute have tended to limit the liability of cities from that fixed by the original statute. By each of them liability is imposed "for all damages that may accrue in consequence of the action of mobs." By the statute of 1858 there was no limit upon this liability. By the statutes of 1866 and 1868 certain things might be shown in mitigation

of damages, and by amendments of 1923 the minimum number to constitute a mob was fixed at five, and the scope of the showing in mitigation of damages was enlarged.

It will be noted the statute makes the city liable for damages resulting from "the action of mobs" within the corporate limits. It is essential (1) that there be a mob within the corporate limits, and (2) that injury results from the action of such mob. So far as the resulting injury is concerned, the petition in this case is not questioned. The question is whether the acts of the four men as alleged or stated are such as to characterize them as a "mob," within the meaning of our statute. That they are characterized as a "mob" by the pleader is not controlling—that is simply the pleader's conclusion. The allegations concerning the acts of the men must determine whether they are properly characterized as a mob. We must therefore seek a definition of the word "mob." The statute does not define the word. We find the following definitions of the word "mob":

"A French term, imported into the English language during the reign of Charles II. The word is not strictly a legal term, but a vernacular word, descriptive of a large and aggravated riot. It is variously defined as an assemblage of many people acting in a tumultuous and riotous manner, calculated to put good citizens in fear and endanger their persons and property; a crowd excited to some violent or wrongful act; a crowd of persons gathered for mischief or attack; a disorderly crowd; the, or a, disorderly element of the populace; a disorderly or riotous gathering or assembly; a promiscuous assemblage of rough, riotous persons; a promiscuous multitude of rioters; a rabble; a throng, a riotous assemblage; a tumultuous rout or rabble; a turbulent or lawless crowd; an unorganized assemblage of many persons intent on unlawful violence either to persons or property. The word 'mob,' in legal use, is practically synonymous with 'riot,' but the latter is the more correct term. 'Mob' also has been held to be practically synonymous with 'riotous assembly.'" (40 C. J. 1231.)

"A tumultuous rout or revel; a crowd excited to some violent or unlawful act. The word in legal use is practically synonymous with riot, but the latter is the more correct term." (Bouvier's Law Dictionary.)

"The disorderly and riotous part of the population, the roughs, the rabble; an assemblage of the rabble; a tumultuous crowd bent on, or liable to be incited to, acts of lawlessness and outrage." (Oxford English Dictionary.)

"A riotous assemblage; a crowd of persons gathered for mischief or attack; a promiscuous multitude of rioters." (Century Dictionary.)

"The difference between a rebellious mob and a common mob is that, the first is high treason, the latter a riot or a felony." (Stroud's Judicial Dictionary.)

Actions founded on this statute have been before this court in the following cases: *City of Atchison v. Twine*, 9 Kan. 350; *Adams v. City of Salina*, 58 Kan. 246, 48 Pac. 918; *Iola v. Birnbaum*, 71 Kan. 600, 81 Pac. 198; *Cherryvale v. Hawman*, 80 Kan. 170, 101 Pac. 994; *Stevens v. Anthony*, 82 Kan. 179, 107 Pac. 557; *Blakeman v. City of Wichita*, 93 Kan. 444, 144 Pac. 816; *Harvey v. City of Bonner Springs*, 102 Kan. 9, 169 Pac. 563; *Easter v. City of El Dorado*, 104 Kan. 57, 177 Pac. 538; *Moore v. City of Wichita*, 106 Kan. 636, 189 Pac. 372; *Wilkins v. City of Mineral*, 109 Kan. 46, 197 Pac. 863; *Sanger v. Kansas City*, 111 Kan. 262, 206 Pac. 891; *Berberick v. City of Topeka*, 119 Kan. 552, 240 Pac. 968; *Hendren v. Arkansas City*, 122 Kan. 361, 252 Pac. 218.

In the earlier cases the crowds and their conduct were such as properly to characterize them as "mobs" within the above definitions. In some of the later cases the definition of an "unlawful assembly," given in R. S. 21-1001, and of the word "mob," as used in R. S. 21-1003, have been used as defining "mob" under the statute in question. This was an inaccurate application of these statutes. Both are criminal statutes enacted later than the statute of 1858 creating a civil liability on the cities.

Our statutes defining and prescribing punishment for unlawful assemblages (R. S. 21-1001) and making it the duty of peace officers to disperse such assemblages (R. S. 21-1002), first appeared in our statute as a part of the crimes and punishment act of 1859 (Laws 1859, ch. 28. See Comp. Laws 1862, ch. 33, §§ 259, 260). In the Cyc. treatment of unlawful assembly (39 Cyc. 831, 835) it is not treated as synonymous with a mob or riot, but in discussing the duty of a peace officer to disperse unlawful assemblies it is said:

"He is not required to postpone his action until the unlawful assembly ripens into an actual riot."

In the footnote it is said:

"The mode of dispersing an unlawful assembly may be very different according to the circumstances attending it in each particular case (*Reg. v. Neale*, 9 C. & P. 431; 38 E. C. L. 256); and an unlawful assembly may be so far verging toward a riot that it may be the bounden duty of the magistrate to take immediate steps to disperse the assembly."

The better view seems to be that an unlawful assembly, instead of being synonymous with a mob or riot, is the incipiency or the formative period of the mob or riot. In 1903 a criminal statute was enacted (Laws 1903, ch. 221), "providing for the suppression of mob violence, defining the crime of lynching, providing a penalty there-

for." (R. S. 21-1003 to 21-1009.) In this statute the word "mob" is defined "for the purpose of this act." The word "lynching" is also defined. But it can hardly be said that the territorial legislature of 1858 had either of these statutes in mind at the time it passed the act making cities liable in damages for injuries that occur in consequence of mobs.

We shall not stop now to examine critically our former cases to see whether a different conclusion would have been reached in any of them if this inaccurate definition of the word "mobs" as used in the statutes creating a civil liability on cities had not been used. It seems clear that in enacting this statute in 1858, and in using the word "mobs" therein, the legislature could not have been influenced by a definition of "unlawful assembly" in a criminal statute enacted by another legislature a year later, nor by the definition of the word "mob" (which definition was limited "for the purposes of this act") in another criminal statute enacted by another legislature, 45 years later. It is much more reasonable to conclude that the legislature of 1858 used the word "mobs" in the statute in question in the sense it was then generally understood and defined in the dictionaries and legal writings—which accords with the definitions hereinbefore set out—as "not strictly a legal term, but a vernacular word, descriptive of a large and aggravated riot—as practically synonymous with riot."

In any event it seems clear the statute was never intended to create a civil liability on cities for what may be spoken of in a general way as ordinary crimes. We do not mean by this that mobs do not commit crimes—they frequently, perhaps usually, do commit crimes—but it is the mass action of the multitude, as distinct from the acts of a few bent on a particular mischief. In *Sanger v. Kansas City*, supra, it was said:

"The legislature did not intend that any three men who deliberately plan to commit murder, robbery, burglary, arson, or any other felony, and who go together and commit that crime, should constitute a mob, under section 3822 of the general statutes of 1915. If the legislature intended to accomplish that result, cities are responsible in damages for much of the crime committed within their limits. Until the legislature specifically says that cities are liable in damages for such crimes when committed by three or more persons, it must be held that cities are not liable under such circumstances." (p. 264.)

Many other states have statutes making cities, or counties, liable in damages for injuries caused by mobs. We shall not undertake an analysis of these statutes and of the decisions construing them,

although such an analysis would support the conclusion here reached. The cases are collected in notes in 13 A. L. R. 751; 23 A. L. R. 297 and 44 A. L. R. 1137.

Without further analyzing the petition and opening statement in this case, it seems clear from what has been said, that there was no "mob" within the meaning of the statute relied upon. It necessarily follows that the judgment of the court below will be reversed with directions to enter judgment for defendant. It is so ordered.

BURCH and HOPKINS, JJ., dissenting.

MASON, J., not sitting.