No. 35,341

Nora Carter, *Appellee*, v. The City of Wichita, *Appellant*.

(122 P. 2d 768)

Opinion filed March 7, 1942.

*Vincent F. Hiebsch,* of Wichita, argued the cause, and *K. W. Pringle,* of Wichita, was on the briefs for the appellant.

*Robert C. Foulston* and *George B. Powers,* both of Wichita, argued the cause, and *George Siefkin, Samuel E. Bartlett, Lester L. Morris, Carl T. Smith, C. H. Morris* and *John F. Eberhardt,* all of Wichita, were on the briefs for the appellee.

The opinion of the court was delivered by

Dawson, C. J.: This was an action to recover damages from the city of Wichita for personal injuries caused by a mob. The case was tried before a jury which answered eight special questions and returned a verdict for the plaintiff. The trial court entered judgment for $2,800 in conformity with the verdict and overruled a motion for a new trial. The defendant appeals.

Brief recital of facts may be made. During the latter part of August, 1939, disputes between several of the Wichita laundries and their employees were the cause of considerable friction between employer and employee representatives. At the plants where conferences between executives and officials of the union were unsuccessful in arbitrating their differences, the disputes resulted in orders directing the employees to strike. Monday afternoon, August 28, 1939, the executives of the Domestic Laundry and Dry Cleaning Company, plaintiff's employer, and the officials of the union held a conference to discuss the employees' demands for changes in wages and working conditions. After this conference, which was a failure insofar as settling the dispute was concerned, a strike was called.

Immediately after the conference, but before appearance of the pickets, the laundry management requested the police department to assign sufficient officers to protect its property and put down vio-

lence, calling attention to recent experiences of other Wichita laundries. The police department replied that "if you have any trouble, you call us and we will take care of the situation from there."

The plaintiff, Mrs. Nora Carter, had been an employee of the Domestic Laundry Company for many years, and at the time of her injuries on Wednesday, August 30, 1939, was in charge of a department in the plant. The evidence tends to show that early on the morning of August 30 several groups of individuals, the largest estimated to include as many as 30 to 40 persons, surrounded the Domestic laundry building and angrily and vigorously, and in several instances using force, refused to permit persons to enter the premises. When the laundry company's engineer drove up to the alley entrance in his car at 6 a.m. a crowd of 15 to 20 persons surrounded his car and forcefully denied him the right to get out. When he returned thirty minutes later in the laundry superintendent's car a "gang" of men and women confronted them and ordered them not to come past the curb, and the engineer had considerable difficulty reaching his office. As one of the route drivers got out of his car and started to step on the curb in front of the office, he was knocked down between his car wheels and the gutter. When a watchman appeared at 6:30 he found several groups milling around the building. They were variously described by witnesses as "cussing," "scuffling," "fighting," "shoving," "grabbing," and "yanking" in their efforts to keep workers from entering the building. Rowdies in the crowds apparently did not know who were laundry workers, for in at least one instance the woman being pushed and shoved was asked: "Do you work here?" We only mention a few of these incidents to show that the groups were not intent upon lawful, peaceful picketing which the law sanctions as a means for workers to further their cause, but instead were an assemblage of persons determined to do bodily injury, if necessary, to persons who might interfere with their objective.

The evidence discloses that for about an hour before plaintiff appeared the night watchman and some of the route drivers attempted to rescue and convoy several employees through the milling crowds. The night watchman, who was a former Wichita police officer, interrupted his convoying duties long enough to call the police station and inform it that he was unable to cope with the situation. When a police car arrived he made it clear to the officers he could not prevent the grabbing and shoving of women who were

trying to enter the building. The five police officers, who were sent to the scene to preserve order, sat in their patrol car near by and did not see the physical violence taking place. We need not say that this inability of the police to see any need for their assistance was sufficient in itself to fasten liability upon the city for the acts of the mob, although in its answer the city joined issues on the question of the diligence or negligence of the police, in argument to the jury, and in special questions presently to be noted.

The plaintiff alleged that on August 30, 1939, at 7:30 a. m. she attempted "in a quiet, peaceable, and lawful manner" to enter the Domestic Laundry Company building "to engage in the daily work where she was then employed"; that a "large crowd of people (approximately 40 to 50 persons)" gathered around the building and "acting in a tumultuous and riotous manner" assaulted, knocked down and inflicted serious injuries to her person; that "the existence of said mob and the commission of acts of violence existing at said time and place were well known to the police department . . . prior to the time of the injuries to the plaintiff, and that said police department . . . failed and neglected and refused to use due diligence and care to prevent the . . . injury to the life and limb of the plaintiff." Judgment for $10,000 damages for the injuries was asked. Prior to commencing action, plaintiff had submitted a claim to the city commission which had been denied after formal hearing. Copy of the claim was made part of the petition.

The defendant denied generally all of plaintiff's allegations and expressly denied "that either defendant, or its agents, servants, or employees, were guilty of any acts of omission or commission which in any manner contributed to or permitted any assault upon plaintiff, or any injury to plaintiff." The case was tried before a jury which returned a verdict for plaintiff for $2,800 and answered special questions:

"1. Was the plaintiff injured as a result of the violence of a mob as defined under the instructions of the court in this action? A. Yes.

"2. Was the plaintiff the aggressor in the action actually resulting in the physical attack? A. No.

"3. Was the conduct of the plaintiff such as to provoke the assault she alleges was made upon her resulting in her injuries? A. No.

"4. Was the conduct of the plaintiff in arriving and attempting to enter her place of business that of a reasonably prudent person under the circumstances? A. Yes.

"5. On Tuesday, August 29, 1939, did the chief of police make any arrange-

ments with the laundry officials of the Domestic laundry for the protection of employees coming into and leaving the laundry plant? A. No.

"7. Did the police department use due diligence and care to prevent the injury to the plaintiff and other employees in the Domestic laundry? ('Due diligence' is defined in the instructions of the court.) A. No.

"8. If you answer question number 7 in the negative, state in what way the police department failed to use due diligence and care. (A. We feel that 'an ounce of prevention would have been worth a pound of cure,' or in other words, the orders given policemen were such that they could not offer protection to either side in the controversy. Especially they should have helped *any* citizen after having been asked *for* help. We think they should have been out of their car patroling and mingling with pickets and persons to prevent fights starting, their closer presence to the activities—the mere sight of a uniformed officer would probably have made a big difference in the outcome of this case."

Judgment was entered accordingly and defendant appeals, contending first that the trial court erred in not sustaining its motions to discharge the jury because of appellee's "persistent use of repetition" in eliciting testimony, and that a new trial should have been granted for the further reason that instruction number 15 was "contrary to law and prejudicial to the rights of defendant."

Appellant does not contend the jury did not have evidence sufficient to prove the injuries were inflicted by a mob as defined by G. S. 1935, 12-201, 12-202, or that the answer to special question 1, above, should be set aside. So, too, the answers to questions 2, 3 and 4 settle all dispute as to the propriety of Mrs. Carter's determination to enter the Domestic Laundry Company building on the morning of August 30, 1939.

Proceeding next to the question whether the jury was prejudicially deterred from an objective determination of the issues of fact by the repetitious conduct of appellee's counsel, or by the court in its instruction number 15 as the law in the case: It should be kept in mind that appellant did not demur or otherwise test plaintiff's allegations that her injuries were caused by a mob, and although we are advised by supplemental specification of error that defendant demurred to the evidence, appellant's case here reflects neither contention nor argument that plaintiff did not adequately establish a case which required the jury to determine whether the injuries were or were not caused by a mob. Consequently, our various definitions of a "mob," and also the governmental philosophy underlying our mob statute as discussed in *Koska v. Kansas City,* 123 Kan. 362, 255 Pac. 57, and *Maus v. City of Salina,* 154 Kan. 38,

114 P. 2d 808, are irrelevant in the instant appeal, and the jury's denomination of this assemblage as a mob is conclusive unless trial errors prejudicial to appellant's rights were committed.

Touching appellant's contention that frequent repetition of questions and reference to allegedly irrelevant evidence caused a miscarriage of justice in this case: The cases must be rare indeed which present such flagrant conduct of counsel in repeating questions to elicit testimony, the text of which is admissible, which would constitute reversible error on appeal. Repetitious practice of counsel, distinguished from admissibility of the evidence offered, to be far enough afield to generate prejudice in the minds of the jury which the trial court did not detect, would almost be impossible to detect in a record on appeal. And it is at least arguable that the monotony of repeating questions by counsel, for the purpose of effectuating a ruse to mislead the jury, would prejudice the jury against the perpetrator rather than his adversary. Be that as it may, inasmuch as the instant controversy presented to the jury only a single issue to be determined, that of whether this assemblage of persons constituted a mob, we do not think it can be said, upon careful reading of the abstract, counter abstract, and supplemental abstract, that conduct of counsel caused the jury to be sidetracked and blinded by prejudice rather than guided by facts during its determination; and nothing in the record tends to show that the trial court abused its discretion in ruling on the objections interposed during the trial of the case.

We come now to appellant's main contention—that the trial court's instruction number 15 was erroneous and prejudicial. The trial court read twenty-eight instructions to the jury, pertinent paragraphs of which may be summarized as follows: number 7 made verbatim recital of our mob statute, G. S. 1935, 12-201, 12-202; number 10 fully defined the term "mob" as intended by our legislature in the mob statute; number 11 admonished the jury that if they should find from the evidence that plaintiff's injuries were not received at the hands of a mob as defined in the instructions, their verdict must be for defendant; number 13 dealt with lawful picketing and the duty of the police not to interfere so long as the picketing remains peaceful. Instructions 15 and 16 read as follows:

### No. 15

"You are further instructed that the purpose of the statute, which has been referred to herein, is designed to prevent disorderly assemblages within

the corporate limits, to require the police officers to take every reasonable means within their power to prevent assemblages which will cause injury or damage to persons or property, to act promptly so that an unlawful assembly shall not ripen into an actual riot, and, to take every means necessary and proper to prevent injury or damage to persons or property.

"In this connection, you are instructed that if there were assembled at the place of plaintiff's employment a group which by words threatening immediate violence, act or deed, violated or threatened immediately to violate the law in any particular, it was the duty of the police officers of the city of Wichita, whether actually present or not, to take immediate steps to disperse the assembly, thus preventing the assembly from ripening into a riotous mob, and thereby preventing injury to person or property.

"In this connection, you are instructed that if police officers were present at the time and place in question, and saw or could have seen, and knew or could have known, that the assembled persons were violating or threatening immediately to violate the law as herein defined, and took no steps to disperse the assembly, or to prevent the injuries that thereafter followed to the plaintiff, if any you find, your verdict herein must be for the plaintiff and against the defendant."

### No. 16

"You are further instructed that you may take into consideration all of the facts and circumstances, including the fact that a strike was on, in determining whether the police department of the city of Wichita used due diligence and care to prevent injury to the plaintiff, and, if you find from the evidence that the police officers of the city of Wichita used due diligence and care to prevent injury to the plaintiff, then you may consider such fact in mitigating damages, if any, which you may allow the plaintiff, if you find that she is entitled to recover."

Appellant saved an objection to the instructions and specifically attacked number 15 on the ground that it "advises the jury, in practically so many words, that if the police officers were present and could have prevented the injury, and failed to do so, then the jury must find for the plaintiff."

We do not believe appellant was prejudiced by the instruction complained of. It should be here noted that although appellant leveled its attack upon the court's instructions, all but instruction 15 have been omitted from its abstract. Upon the record, it may well be argued that instruction 15 did not clearly state how the police officers' inertia should be evaluated by the jury. But when considered in conjunction with instructions 7, 10, 11, and 16, which defined for the jury what a mob is under our statute and decisions, any want of clarity in the criticized instruction was innocuous. In fact, in the light of what other instructions contained, the instruction complained of is against the appellee's case more than it

is the appellant's. We think it is susceptible of the impression that the jury would have to find the injury was caused both by a mob and by the negligence of the police officers before it could find for plaintiff. However, even granting possible incongruity of instruction 15, the verdict should not be set aside because instructions 7, 10, 11, and 16 stated the law of the case correctly and the jury's special findings are clearly consistent. (See: *Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 90-91, 98 P. 2d 162; *Jacobs v. Hobson*, 148 Kan. 107, 111-112, 79 P. 2d 861; *Forbes v. Railway Co.*, 101 Kan. 477, 479-480, 168 Pac. 314.) See, also, *Marshall v. Home Mutual Ins. Co.*, 154 Kan. 488, 494, 119 P. 2d 529; *Davis v. McCarthy*, 52 Kan. 116, 34 Pac. 399, and cases cited.

In the brief and oral argument, counsel for appellant seek revaluation of its case upon the ground that an entirely new relationship of capital and labor has arisen during recent years which recognizes the right of striking workmen to practice peaceful picketing. Quite true, but as the paramount public 'interest is the welfare of the general public, the emphasis must be on the adjective and not on the noun. (31 Am. Jur., 952-955.)

The judgment of the trial court is affirmed.

HOCH, J., not participating.