No. 35,115

FRANK MAUS, *Appellee,* v. THE CITY OF SALINA, *Appellant.*

(114 P. 2d 808)

Opinion filed July 5, 1941.

W. S. *Norris* and *Homer B. Jenkins,* both of Salina, for the appellant.

No appearance was made for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action to recover damages under the mob statute. The city of Salina, defendant, appeals from an order overruling its demurrer to the petition. The sole question presented is whether the alleged wrongdoers constituted—under the allegations of the petition—a "mob" within the meaning of G. S. 1935, 12-201.

The section reads as follows:

"All incorporated cities and towns shall be liable for all damages that may accrue in consequence of the action of mobs within their corporate limits, whether such damage shall be the destruction of property or injury to life or limb: *Provided, however,* That the number of persons that shall constitute a mob under this act shall be five or more."

Omitting allegations which constitute mere conclusions of the pleader, the facts alleged were, in substance, that the plaintiff and his wife had resided for many years in Salina, were devoted to each

other and spent most of their time in their home; that the plaintiff was an inventor, writer, consulting engineer, devoting "all his time and energy to his writings, inventions, and mathematical solutions"; that on the evening of September 8, 1939, six persons—whose names were given—and others whose identity he did not know, prowled for a time about his house and then violently forced their way into the house and assaulted him; that they maliciously and violently jumped upon him, pressed his head with such force against the floor as to make him unconscious; that as a result of the assault he was severely injured and suffered great mental anguish and nervous shock; that after entering his house they "conducted themselves in a turbulent and destructive manner, pilfering and ransacking all the rooms, drawers, cabinets," etc.; that prior to their entry into his house he was aroused by their prowling about the house, and fearing for his life, he armed himself with "a small pistol belonging to his wife," and going to the door demanded to know who was there, and receiving no reply, he opened the door, whereupon the persons named violently forced their way in, took the pistol "from his pocket" and committed the assault; that he "is unable to state the exact amount of damage to the property and loss sustained by reason of the said certain persons or mob referred to." Judgment was asked for $20,-510, made up as follows: property damage $5,000, personal injuries $15,000, X-ray expense $10, doctor's bills and hospitalization which plaintiff believed he would have to incur, $500.

Prior to commencing action appellee had submitted a claim to the city commission which had been denied after formal hearing. Copy of the claim, which contained substantially the same allegations, was made part of the petition. Three statutes were cited as having been violated—the so-called mob statute (G. S. 1935, 12-201), the statute relating to unlawful assemblies (G. S. 1935, 21-1001), and the statute relating to lynching (G. S. 1935, 21-1003).

Appellee made no oral argument here and has submitted no brief in the case. Contending that the petition alleges nothing more than the commission of criminal acts by various individuals, and that it does not state facts constituting liability of the city under the mob statute, appellant relies principally upon the holding in *Koska v. Kansas City*, 123 Kan. 362, 255 Pac. 57, and upon the definitions of the word "mob" therein contained, taken from the various dictionaries and textbooks. We are advised in appellant's brief that the six alleged wrongdoers were in fact peace officers of the county and

city who had gone to appellee's home in response to a report that appellee was demented, was in need of restraint and that a serious crime had been committed. Inasmuch, however, as the issue is here on demurrer, we can take note only of the allegations of the petition, which does not disclose that the six men were officers or that they had come to the house on any lawful mission.

One question can readily be disposed of. In determining whether there was a "mob" for whose actions the city would be liable, the provisions of G. S. 1935, 21-1001 and 21-1003, which deal with unlawful assembly and with lynching, may not be read into G. S. 1935, 12-201. This was definitely held in the Koska case, *supra*. Our inquiry, accordingly, is solely whether the legislature intended in the so-called mob statute to make cities liable in damages for personal injuries and losses suffered in the manner and under the circumstances alleged in the instant petition.

There are no descriptive words in the statute to give color and content to the bare word "mob." The only qualification is that at least five persons must be involved. It would not be easy, therefore, to determine the legislative intent even if we were here dealing with the question for the first time. The task is made more difficult by the obvious lack of harmony in our prior decisions interpreting the statute and applying it to specific facts. This conflict in preceding cases was frankly recognized in the opinion in the Koska case, written by Justice Harvey, and decided in 1923. It was there definitely held that in some of the later cases, prior thereto, the court had erred by transporting words from the later "unlawful assembly" and "lynching" statutes for the purpose of determining the meaning of the word "mob" in the mob statute. The reasons for so holding were convincingly set forth (see 123 Kan. 366, 367).

It may be of some interest to note that the mob statute has been before this court seventeen times. In six of the cases the issue turned on questions not pertinent here—the existence of a "mob" in those cases not being seriously questioned. In seven of the remaining eleven cases the acts complained of were held to have been committed by a "mob" and in the other four the holding was otherwise. The particular facts involved do not convincingly account, in all cases, for the contrary holdings. This confusion might well be treated as put to rest by the well-considered opinion in the Koska case, were it not for a subsequent decision presently to be noted.

Let us first note briefly the legislative history of the mob statute

(for fuller statement see 123 Kan. 364). It was enacted first by the territorial legislature of 1858; amended in 1866; reënacted in 1868; amended in 1923. The effect of the amendments has been to further limit liability—the principal changes being to raise from three to five the number of persons necessary to constitute a mob, and to broaden the scope of matters that may be shown in mitigation of damages. (G. S. 1935, 12-202.)

In interpreting the word "mob" as used in the mob statute, we need to consider not only the dictionary and textbook definitions of the term, but also the theory and purpose that lie back of such enactments. In the Koska case it was said that the word is a vernacular rather than a strictly legal term and that it is reasonable to conclude that the legislature of 1858 used the word in its generally accepted meaning. What, then, is the popular understanding of the meaning of the word? It is perhaps impossible to fix exactly, by definition, the "four corners" of the term, but its substantial content is well enough understood. When we think of a mob we instinctively visualize an assemblage of persons excited or incited to violent action, having thrown restraint to the winds, reckless and headlong in their unlawful designs, determined to brook no opposition to their common purpose, and ordinarily characterized by noisy and riotous disturbance of the public peace and order. Or, we think of a frenzied group, defiant of the orderly processes of punishment, moving in concerted action to wrest some alleged culprit from lawful custody and wreak vengeance upon him. Perhaps not every characteristic above enumerated is present in every particular instance, but such is the general substance of the term as popularily understood. In the Koska case will be found collected various definitions from standard authorities, which need not be here repeated, but which are in line with what has here been said.

We turn now to the theory and purpose of statutes imposing liability upon communities for the action of mobs. While such liability is not a common-law one, such statutes are of ancient origin and have been enacted by many states. The reasoning, the governmental philosophy, which motivates them has been variously expounded. It may be said that the purpose is to take the burden of damages and loss, so suffered, from the individual and place it on the whole community—on the theory that it is unjust to compel the individual to bear it. It may be said that the purpose is to promote public order by making every person, and particularly every tax-

42

payer, personally interested in reporting to the officers every developing public disorder of which he may have knowledge. The idea may be that such a law makes peace officers more alert and effective, through fear of an aroused public displeasure which results when the whole community is required to make restitution. Whatever may be regarded as the principal purpose of such laws, the basic idea is that an organized community must maintain peace and order and must maintain orderly process in the administration of justice, and must be held responsible in damages for failure to do so effectively. The fact that in some particular case the statute may seem to work injustice by making the municipality liable even though it was unable to prevent the mob action (*Iola v. Birnbaum*, 71 Kan. 600, 81 Pac. 198) does not weaken the argument as to community responsibility. Such an instance merely illustrates the truth that a general law, founded upon sound considerations, may sometimes seem unjust in a particular case. Such laws must find their justification in their ordinarily helpful effect, and their long-run results in promoting the general welfare.

It was a time of bitterness and turbulence, of widespread disorder, when our statute was first enacted in 1858. In his message to the legislature that year the acting governor of the territory called attention to the existence of organized bands "whose members are bound by the most solemn oaths and obligations to resist the laws, take the lives of their fellow citizens, or commit other acts of violence" and urged the passage of laws to meet the situation. Out of that condition and temper of the times came this law to make municipalities liable in damages for acts of mobs. It is not reasonable to believe that it was the legislative intent to impose such liability for every crime committed by a number of persons acting in concert. (See *Sanger v. Kansas City*, 111 Kan. 262, 264, 206 Pac. 891.)

We must now note the case of *Seigler v. Kansas City*, 131 Kan. 504, 292 Pac. 937, decided in 1930—seven years after the Koska case. In that case the plaintiff had bought from a local automobile dealer a car which, as he apparently believed, proved to be defective. Whereupon he put a large sign on the car, reading: "I bought this Essex from Davidson Brothers, Kansas City, Kan., and I am sorry now," and drove about town. An employee of the local dealer got in touch with him and they drove back to the Davidson garage. While they were in the garage and while repairs were being made, a heated controversy took place, a general brawl ensued in which a

number of men then in the garage knocked the plaintiff down and severely injured him. Although there had been nothing in any way resembling a public riot, although no public disturbance of any sort was shown to have taken place on the streets or in any other public place, and although the whole affair was simply a fight within a garage, recovery of $5,000 against the city, under the mob statute, was allowed by a divided court. We find no sound basis for distinguishing the Seigler case from the Koska case and regard it as a reversion to some of the earlier cases clearly repudiated in the latter case. In the Koska case it was alleged that a mob of four men broke into plaintiff's house for the purpose of intimidating and assaulting her, that they ransacked the place, opening drawers, cabinets, broke open a trunk, attempted to secure money, and "thereupon all four men attacked plaintiff, kicking her, striking her with their fists, tearing off her clothes, exposing her entire person to the jests of the mob and striking her on the head with a gun." Heinous as the offenses were—for which severe penalties are provided—it was held, for reasons convincingly stated, that the miscreants did not constitute a mob within the meaning of the statute imposing civil liability upon cities. In the Seigler opinion the Koska case was distinguished on the ground that in the latter it was not shown that there was "any excitement or tumult." The argument is wholly unconvincing. Even on the mere basis of "excitement" and "tumult" the assault on the woman in the house would seem to measure up very well with the assault on the man in the garage! Carried to its logical conclusion, the holding in the Seigler case would impose upon cities a liability to pay damages for the commission of almost any crime participated in by as many as five men, even though committed without the knowledge of city officials or of private citizens generally and without any accompanying public disturbance that might be said to impute such knowledge to them. Such an interpretation of the legislative intent is wholly unreasonable and ignores the sound principles upon which such statutes are bottomed. We regard the holding of the Seigler case as untenable, and that case is hereby overruled.

In the light of what has been said we now examine the allegations in the instant case. Boiled down, the facts, as alleged, are that certain persons, after prowling for a time about the house of the appellee, violently forced their way into the house when the door was opened, ransacked the house—opening drawers, cabinets, etc.—

damaged or made away with personal property and in a turbulent, destructive and unlawful manner violently assaulted and seriously injured him. We have here the description of the commission of various criminal acts—house breaking, robbery, felonious assault. If this is a description of "damages that may accrue in consequence of the action of mobs" within the meaning of the instant statute, then it would be hard to imagine a case involving these particular crimes which would not render the city liable if committed by as many as five persons. There was no allegation of a riotous, tumultuous assemblage disturbing the public peace; no allegation of an excited and turbulent group pursuing its headlong way in reckless defiance of law; no allegation of a band of men bent on vengeance, or forcibly taking the law into its own hands; no allegation of any public clamor which might impute to peace officers even constructive notice of a lawless outbreak either actual or incipient. By this we do not suggest that all such elements would have to exist in order to constitute a mob, within the instant statute, but only that the allegations must in some clear and definite way describe such a mob and its actions.

We conclude that the petition did not state a cause of action under the mob statute, and that the trial court erred in holding otherwise. The judgment must be reversed with directions to sustain appellant's demurrer to the petition. It is so ordered.