No. 47,576

COMMERCIAL UNION INSURANCE COMPANY OF NEW YORK; NEWARK INSURANCE COMPANY OF NEW JERSEY; RELIANCE INSURANCE COMPANY OF PENNSYLVANIA, *Appellants*, v. THE CITY OF WICHITA and GEORGE LUX, *Appellees*.

(536 P. 2d 54)

Opinion filed May 10, 1975.

*Frank C. McMaster,* of McMaster and Smith, of Wichita, argued the cause and was on the brief for the appellants.

*H. E. Jones,* of Hershberger, Jones, Patterson and Thompson, of Wichita, argued the cause, and *John Dekker,* city attorney, was with him on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This action arose out of the fire bombing of the Gentry Shop, a Wichita clothing establishment, in the early morning hours of August 10, 1968. Plaintiffs are three insurance companies which had issued fire policies on the establishment and who paid the owner an aggregate of $141,748.01 for the loss sustained. As subrogees they brought this action to recoup the loss from the City of Wichita, the Wichita chief of police, the assistant chief of police, and Detective George Lux. Their theory of liability, as set forth in the pre-trial order, was:

"The plaintiffs contend that they are entitled to recover under and by virtue of K. S. A. 12-203 and 12-204, and under the provisions of K. S. A. 21-1001 and 21-1002, and further contend that said defendants are required to respond, regardless of whether or not said actions could have been prevented with the facilities available."

K. S. A. 1974 Supp. 12-203 and 12-204 are our present "mob" statutes; K. S. A. 21-1001 and 21-1002 (since repealed) prohibited unlawful assemblies.

A motion for summary judgment was sustained in favor of each of the individual defendants and the case went to trial before a jury against the city alone. The jury verdict was in favor of the city, and plaintiffs have appealed. As to the individual defendants, plaintiffs claim error only in the summary judgment for Detective Lux, so that he and the city are the two appellees.

The Gentry Shop is located at 17th and Holyoke, in northeast Wichita near Wichita state university. Across the street is a Peter Pan ice cream store. In early August, 1968, there had been some

degree of racial turbulence in Wichita punctuated by an occasional fire bombing. When Detective Lux went on duty around 6:00 or 7:00 o'clock the evening of August 9, his lieutenant advised him "there had been some problems with some young black males at the Peter Pan Store, that they had made a comment that they would come back and burn it down."

Lux, having no particular assignment as a detective that evening, patrolled the northeast section of town. At about 11:00 p. m. he stationed himself in his car on Fairmount (a block from Holyoke) just off 17th Street, where he could observe the Peter Pan store without being seen. From his vantage point he could survey the intersection of 17th and Holyoke and also see the Gentry Shop. He stayed there for about two hours although, he said, "Several times I was ready to pull off, go get a cup of coffee, however I just stuck around. But there was no activity that called, that needed a detective there."

About 1:00 a. m., as Lux continued his vigil, he saw two cars come from the west on 17th and turn south on Fairmount. One was a two-tone green Dodge, the other a small white compact. They were traveling at a normal speed and doing nothing unusual. A few minutes later he observed four black males come from the south on Holyoke to the intersection of 17th. Three went into an L-shaped recess where the Gentry Shop was, and one stayed on the sidewalk. They were not carrying anything Lux could see, but his suspicions were apparently aroused because he engaged in prompt action. In his words:

"I started to pull out; I was attempting to get on the radio, on the air, to notify the dispatcher to send another car up into the area. As I started moving, I saw all four run. I then saw a bright red flare. Pulled on down to the intersection of Holyoke. I did see a front window in this area was burning. I went south on Holyoke and to 16th Street. I started to stop and talk with several white males that was right around the corner on 16th off of Holyoke to see if they had seen any black males. About that time I did see the Dodge I had seen earlier pull off of Fairmount onto 16th going east. I then gave chase."

He chased the Dodge some twenty to thirty blocks before stopping it and apprehending four of its five occupants. The fifth, who ran away, was apprehended later. Of the five, only one was over eighteen years of age. Two were fifteen, and two were sixteen or seventeen. All were black. Three of the four who were apprehended by Lux gave tape recorded statements later that morning

to Lux and a fire department investigator. Transcripts of these statements were admitted into evidence as plaintiffs' exhibits.

In their statements the three young men told of being at a party earlier that evening at 18th and Hydraulic in Wichita. (There is no evidence that the police had any knowledge of this party until these statements were taken.) There were thirty to forty people of both sexes there, and the idea came up to set fire to several businesses with Molotov cocktails. Four businesses were mentioned, including the Gentry Shop.

Acting on this suggestion five party-goers departed in the green Dodge. They were followed by two others in a white compact Pontiac. They first secured two soda pop bottles from the home of one of the boys, and then sought gasoline. From the hose of a pump at a station closed for the night they drained enough gasoline to fill one bottle. A strip torn from one of their shirts served as a fuse. Thus equipped they proceeded to the Gentry Shop, with the results previously described.

The two occupants of the white Pontiac had driven away before the fire bombing and took no active part in it. It was stipulated in the pre-trial order that "the actual fire bombing and loss was participated in by less than ten (10) persons, but that said persons had previous thereto been at a party in the 1800 block of North Hydraulic Street, Wichita, Sedgwick County, Kansas, attended by more than ten (10) persons."

The principal underlying issue in this case is whether the facts set forth above establish a submissible case of liability against either the city or Detective Lux. We hold that they do not.

In so holding we proceed on plaintiffs' theory below that this is purely a statutory action, as set forth in the pre-trial order quoted above. That order supersedes the pleadings and controls the subsequent course of the action. K. S. A. 60-216; *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 522 P. 2d 401. There was no challenge to that order either below or here, and no effort was made to have it amended. We note that in discussing the court's proposed instruction plaintiffs' counsel was vehement in his assertion that "There was nothing in my opening statement about negligence. There was nothing in my opening statement about misconduct. There was in my opening statement, statements about what the police failed to do, which would be the same thing, and can be argued under the statutory mob definition that you give herein later." Hence we are not called upon to determine questions of common law

liability for negligence or official misconduct, or to reconsider the issue of governmental immunity.

We turn, then to the "statutory mob definition" which controls the city's liability. The pertinent statutes are K. S. A. 1974 Supp. 12-203 and 12-204:

"A city shall be liable in damages for injuries to persons or property caused by the action of a mob within the corporate limits of the city if the city police or other proper authorities of the city have not exercised reasonable care or diligence in the prevention or suppression of such a mob. The city shall have all of the defenses in such action that are available to parties in tort actions."

"As used in this act, the word 'mob' shall mean an assemblage of ten (10) or more persons intent on unlawful violence either to persons or property."

These statutes were enacted in 1967 (Laws 1967, ch. 80) and replaced former K. S. A. 12-201 and 12-202. The prior statutes had been on the books since territorial days, with only slight modifications; their history is traced in the leading case of *Koska v. Kansas City*, 123 Kan. 362, 255 Pac. 57. They imposed absolute liability on a city for damages caused by a mob, although some showing in mitigation of damages was permitted. There was no statutory definition of the term "mob" itself, and the *Koska* court resolved this by finding that the term encompassed the common dictionary definitions. These included:

"A French term, imported into the English language during the reign of Charles II. The word is not strictly a legal term, but a vernacular word, descriptive of a large and aggravated riot. It is variously defined as an assemblage of many people acting in a tumultuous and riotous manner, calculated to put good citizens in fear and endanger their persons and property; a crowd excited to some violent or wrongful act; a crowd of persons gathered for mischief or attack; a disorderly crowd; the, or a, disorderly element of the populace; a disorderly or a riotous gathering or assembly; a promiscuous assemblage of rough, riotous persons; a promiscuous multitude of rioters; a rabble; a throng, a riotous assemblage; a tumultuous rout or rabble; a turbulent or lawless crowd; an unorganized assemblage of many persons intent on unlawful violence either to persons or property. The word 'mob,' in legal use, is practically synonymous with 'riot,' but the latter is the more correct term. 'Mob' also has been held to be practically synonymous with 'riotous assembly.'" (40 C. J. 1231.)

"A tumultuous rout or revel; a crowd excited to some violent or unlawful act. The word in legal use is practically synonymous with riot, but the latter is the more correct term." (Bouvier's Law Dictionary.)

"The disorderly and riotous part of the population, the roughs, the rabble; an assemblage of the rabble; a tumultuous crowd bent on, or liable to be incited to, acts of lawlessness and outrage." (Oxford English Dictionary.)

"A riotous assemblage; a crowd of persons gathered for mischief or attack; a promiscuous multitude of rioters." (Century Dictionary.)

"The difference between a rebellious mob and a common mob is that, the

first is high treason, the latter a riot or a felony." (Stroud's Judicial Dictionary.) (p. 365.)

The same idea has been reiterated in *Maus v. City of Salina*, 154 Kan. 38, 114 P. 2d 808; *Hanners v. Kansas City*, 154 Kan. 324, 118 P. 2d 532; and *Lee v. City of Kansas City*, 175 Kan. 729, 267 P. 2d 931.

Our present statute, of course, does contain a statutory definition. The question arises whether it was meant to convey any different meaning than that ascribed to the word in our previous cases. In *Cherryvale v. Hawman*, 80 Kan. 170, 101 Pac. 994, the jury was instructed that "a mob is an unorganized assemblage of many persons intent on unlawful violence, either to persons or property." The chief difference between this definition and our present 12-204 is that the statute requires "ten (10) or more," rather than merely "many," persons for an assemblage to constitute a mob. The court in that case said that "This definition, which appears to have originated in Abbott's Law Dictionary, is substantially that usually given by the courts and textwriters." (p. 171.) The court held that the instruction was adequate to carry with it the implication of "riot," which is an element found essential to a mob in the later cases cited above.

In the present case the trial court, after quoting section 12-203, in instruction No. 8 gave the jury verbatim the text of 12-204. In instruction No. 9 it gave additional definitions of a mob containing the elements of riot and disorderliness, paralleling those found in *Koska*, and quoted above. It concluded its instruction No. 9 by saying:

"Before you can find for the plaintiff you first must find that the gathering or party on North Hydraulic did constitute a mob as above described."

Plaintiffs complain of this portion of the instruction because they say it required the jury to find a mob "as above described," *i. e.*, as described in instruction No. 9. It would have been sufficient, they argue, for the jury to have found the existence of a mob as defined in the statute, as set out in instruction No. 8. They point to questions submitted to the court by the jury after it had retired to deliberate asking whether No. 8 was complete, whether No. 8 and No. 9 should be read together, or whether one took precedence over the other. These questions, they say, indicate that the jury was misled and confused. The court declined to give any additional instructions.

We find no reversible error in the instructions for two reasons. First, even if the jury construed the instructions as plaintiffs say they might have, we believe they would have been correctly instructed. We believe that an element of riotous or disorderly behavior, causing a disturbance of the public peace, is a necessary ingredient of a "mob" as defined in K. S. A. 1974 Supp. 12-204. That was the thrust of instruction No. 9.

The requirement of such an element is well established in the cases cited. The court has consistently rejected the idea that the mere commission of a crime of violence is mob action, even if perpetrated by a number of persons exceeding the statutory minimum for a mob. In *Koska*, at a time when three persons constituted a statutory "mob," four men broke into plaintiff's house, ransacked it and assaulted and abused her. There was no mob action found, the court saying:

"In any event it seems clear the statute was never intended to create a civil liability on cities for what may be spoken of in a general way as ordinary crimes. We do not mean by this that mobs do not commit crimes—they frequently, perhaps usually, do commit crimes—but it is the mass action of the multitude, as distinct from the acts of a few bent on a particular mischief." (123 Kan. at 367.)

In *Maus v. City of Salina*, supra, the court found no mob action where six men (the statute then required five) forced their way into plaintiff's house, assaulted and beat him and pilfered and ransacked all the rooms in the house. In so holding the court found that it could not distinguish the case from *Seigler v. Kansas City*, 131 Kan. 504, 292 Pac. 937, where plaintiff was permitted to recover for a beating administered by a number of men in a garage. The court compared *Seigler* to *Koska* and said:

". . . In the Seigler opinion the Koska case was distinguished on the ground that in the latter it was not shown that there was 'any excitement or tumult.' The argument is wholly unconvincing. Even on the mere basis of 'excitement' and 'tumult' the assault on the woman in the house would seem to measure up very well with the assault on the man in the garage.' Carried to its logical conclusion, the holding in the Seigler case would impose upon cities a liability to pay damages for the commission of almost any crime participated in by as many as five men, even though committed without the knowledge of city officials or of private citizens generally and without any accompanying public disturbance that might be said to impute such knowledge to them. Such an interpretation of the legislative intent is wholly unreasonable and ignores the sound principles upon which such statutes are bottomed. We regard the holding of the Seigler case as untenable, and that case is hereby overruled." (154 Kan. at 43.)

In discussing the legislative history of the act the court in *Maus* noted of the amendments made until that time that "The effect of the amendments has been to further limit liability—the principal changes being to raise from three to five the number of persons necessary to constitute a mob, and to broaden the scope of matters that may be shown in mitigation of damages." (*Id.*, p. 41.) The thrust of the 1967 amendment (by substitution) as we see it was to limit liability even further. The minimum number was raised from five to ten, and instead of absolute liability tempered by mitigation of damages we now have a "reasonable care or diligence" standard, with all defenses available to the city that are available to the defendant in any other tort action. In view of this trend we cannot believe there was any legislative intent in 1967 to impose liability on the city for crimes committed by persons who are not part of a mob, as that term had been previously defined, even if ten or more persons do band together to commit the crime.

Reading the 1967 statute in its entirety and construing its two sections together reinforces our conclusion. Section 12-203, the operative section, creates liability for damages "caused by the action of a mob." It does *not* say, "caused by the action of a mob *or any part thereof*." Likewise, there is liability only if the city fails to use reasonable care and diligence "in the prevention or suppression of such a mob." It does not say "in the prevention of any crime." We think it clear that our present statute, like its predecessor, was aimed at "the mass action of the multitude, as distinct from the acts of a few bent on a particular mischief." (*Koska*, supra.)

Which brings us to the second reason there was no prejudicial error in the instructions. It is undisputed that there was no "mob" involved in the actual fire bombing—there were only five people there. Only the gathering at 18th and Hydraulic had enough people present to constitute a mob, assuming it met the other requirements discussed above. But the damage here was not "caused by the action of" that group, as the statute requires. It was caused by the action of only five people, even though they had been part of the larger group at one time. There was simply not the "mass action" we read the statute as requiring.

Of course, not every member of a mob must participate in the actual injury before there can be liability, but there must be some sort of mob participation. The cases cited by the plaintiffs do not hold to the contrary. In *Wilkins v. City of Mineral*, 109 Kan. 46,

197 Pac. 863, the plaintiff was assaulted on the street and beaten by only one man, but there were twenty-five or thirty onlookers standing by and shouting encouragement to the assailant. To support plaintiff's judgment this court found that "there was ample evidence to support a finding that a considerable number of the onlookers were virtual participants in the assault, that they knew it was to take place, encouraged the assailant, and presumably by their attitude restrained the interference of any who might have had a disposition to come to the assistance of the plaintiff." (p. 47.) And in *Yalenezian v. Boston*, 238 Mass. 538, 131 N. E. 220, there was " 'a large crowd of people . . . in the street in the vicinity of the plaintiff's store,' shouting, shooting dice for money, singing, dancing and fighting to a degree that a witness testified that 'things were terrible there, and we were afraid to go through the street.' " (238 Mass. at 542.) The Massachusetts act required twelve or more persons, "riotously or tumultuously assembled." The court found there was a riot, saying:

". . . There was evidence that more than twelve persons were tumultuously assembled; there was evidence that from the crowd twelve or more persons broke into and entered the stores of the plaintiffs in the night time; there was evidence that fifteen or twenty persons with a common purpose of larceny entered the stores and carried away from the stores personal property, and by concert of action gave aid, assistance and countenance to each other." (*Id.*, p. 543.)

In each case, it will be noted, the mob was present and its immediate influence was being exerted on those members who committed the injury. (Additionally, in the Massachusetts case the number of persons doing the looting was itself sufficient to constitute a statutory mob.) That is not the case here.

Here, in our opinion, even an indisputable finding that there had been a "mob" at 18th and Hydraulic would not have supported a finding of liability for the acts of these few committed at least a mile away and some period of time after they separated themselves from the "mob." Had the entire party, or at least ten of them, proceeded en masse to the Gentry Shop we would have an entirely different situation.

The result is that the city's motion for judgment at the close of plaintiffs' evidence should have been sustained. The judgment below was correct, and it will be sustained even if arrived at by a process which might be erroneous. K. S. A. 60-2105. And cf., *Wallace v. Magie*, 214 Kan. 481, 522 P. 2d 989; *City of Hutchinson v.*

*Hutchinson, Office of State Employment Service,* 213 Kan. 399, 517 P. 2d 117. Since the issue of a mob at 18th and Hydraulic should not have been submitted to the jury, any errors there might have been in the instructions would be moot.

Plaintiffs also claimed liability under former K. S. A. 21-1001 and 21-1002. The first of these, the "unlawful assembly" statute, made it unlawful for three or more persons to assemble with the intent to do any unlawful act against the person or property of another by force and violence, if they made "any movement or preparation therefor." The second made it the duty of any judge or peace officer who actually saw anyone committing the offense proscribed by 21-1001 to command those unlawfully assembled to disperse. To accomplish the dispersal the judge or peace officer was authorized to call upon the citizenry for assistance, and they were required to furnish it.

As to the city, the trial court took any claim under these statutes away from the jury at the close of the evidence. In so doing it was clearly right. Both *Maus* and *Koska* unequivocally state that the unlawful assembly statutes (21-1001 *et seq.*) in the Crimes Act have nothing to do with a city's liability for mob action, and are not to be read into the mob statute. See Syl. ¶ 2 of each case. And there was nothing in the unlawful assembly statutes themselves which would remotely suggest they were intended to impose any civil liability.

As to Detective Lux, plaintiffs argue that he breached his duty under 21-1002 to order the dispersal of the four boys in front of the Gentry Shop, and that such a breach of a statutory duty made him personally liable for the ensuing damage. It was therefore error, they say, to grant his motion for summary judgment. There is no merit to this contention.

The statute amounts to a codification of the common law duty of a peace officer to preserve the peace. The duty owed is to the public at large, and not to any particular individual. For the breach of such duty an officer is answerable only to the public acting through its official representatives, and not to any particular individual. Speaking of a sheriff, the original conservator of the peace under the common law, the United States Supreme Court said in 1856:

"It is an undisputed principle of the common law, that for a breach of a public duty, an officer is punishable by indictment; but where he acts ministerially, and is bound to render certain services to individuals, for a compen-

sation in fees or salary, he is liable for acts of misfeasance or nonfeasance to the party who is injured by them.

"The powers and duties of conservator of the peace exercised by the sheriff are not strictly judicial; but he may be said to act as the chief magistrate of his county, wielding the executive power for the preservation of the public peace. It is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only.

"The history of the law for centuries proves this to be the case. Actions against the sheriff for a breach of his ministerial duties in the execution of process are to be found in almost every book of reports. *But no instance can be found where a civil action has been sustained against him for his default or misbehavior as conservator of the peace, by those who have suffered injury to their property or persons through the violence of mobs, riots, or insurrections.*" (*South et al. v. State of Maryland, Use of Pottle.*, 59 U. S. [18 How.] 396, 402-3, 15 L. Ed. 433. Emphasis added.)

The rule appears to have been universally followed, in the absence of a constitutional or statutory provision imposing liability. See Anno., *Police-Personal Liability*, 41 A. L. R. 3d 700, and especially § 4, *"Injuries from riots and mob violence."*

Our own rule is that "executive officers are not liable for errors in the performance of duties involving discretion and judgment, in the absence of malice, oppression in office or willful misconduct." (*Hicks v. Davis*, 100 Kan. 4, 163 Pac. 799, Syl. See also, *Evans v. Marsh*, 158 Kan. 43, 145 P. 2d 140; *City of Hutchinson v. Hutchinson, Office of State Employment Service*, supra. And cf., *Gardner v. McDowell*, 202 Kan. 705, 451 P. 2d 501, where the element of "wantonness" was included.) No malice, oppression, wantonness or willful misconduct was asserted against this policeman. It follows that on the issue of liability under the statutes, as framed in the pretrial order, no cause of action was stated against Detective Lux and he was properly dismissed from the suit.

One final contention of plaintiffs deserves mention. They complain that the trial court refused to order the city, in response to interrogatories, to furnish the names, addresses and telephone numbers of all police officers and reserve police officers employed by the city on the date of the fire; and also the names, addresses and telephone numbers of all such officers who were on duty eight hours before and five hours after the fire. This information, they say, would have permitted them through pretrial discovery to develop fully the exact extent of the police department's advance knowledge of the fire bombing. Two officers at the scene were reported to have told a newspaper reporter that the department knew either the Peter Pan store or the Gentry Shop was to be a target.

The city responds by pointing out that in its answers to plaintiffs' interrogatories it did furnish the names of the six officers and fifteen firemen who were at the scene at the time of the fire and within six hours afterwards, and that plaintiffs nevertheless took not a single deposition. This would seem to be a sufficient answer. If plaintiffs really sought the information they now claim was vital, taking the depositions of the officers on the scene who were the source of the original report would seem to have been an appropriate way to go after it and the logical first step. We cannot find prejudice from the failure to furnish more names when plaintiffs failed to utilize those they had. The control of discovery is entrusted to the discretion of the trial court. K. S. A. 1974 Supp. 60-237 (*a*) (2) and 60-226 (C); *Tilley v. International Harvester Co.*, 208 Kan. 75, 490 P. 2d 392, Syl. ¶¶ 2 and 3. We find no abuse of that discretion here.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.