No. 53,922

SANDRA SUE GRIFFIN, Individually and as next friend and guardian of MICHAEL SCOTT GRIFFIN and MICHELLE LYN GRIFFIN, minors, *et al., Appellants,* v. BRUCE AND VEDA ROGERS, d/b/a WHIPPOOR-WILL SHOWBOAT; KANSAS STEAMBOAT COMPANY, INC.; MISSOURI VALLEY STEEL, INC.; AQUAMARINE CORPORATION; KANSAS PARK AND RESOURCES AUTHORITY; and the OSAGE COUNTY SHERIFF'S OFFICE, *Appellees.*

(653 P.2d 463)

Opinion filed November 8, 1982.

*James P. Nordstrom,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *David B. Brushwood,* of the same firm, was with him on the brief for appellant Griffin.

*Charles A. Briscoe,* of Scott, Quinlan & Hecht, of Topeka, argued the cause, and *Robert D. Hecht,* of the same firm, was with him on the brief for appellants Peterson and Patterson.

*David Hanson,* of Glenn, Cornish, Schulteis & Hanson, of Topeka, argued the cause and was on the brief for appellant Lilly.

*Gene E. Schroer* and *Dan Wulz,* of Jones, Schroer, Rice, Bryan & Lykins, Chartered, of Topeka, were on the brief for appellant Vogel.

*Robert L. Roberts,* of Gehrt & Roberts, Chartered, of Topeka, and *Paul H. Neiwald,* of Neiwald, Risjord & Waldeck, of Kansas City, Missouri, were on the brief for appellant Schwartz.

*Kenneth Stevens,* of Wichita, and *Michael Roach,* of Wichita, were on the brief for appellants Nelson.

*Michael Schenk,* of Marshall, Hawks, Hendrix, Schenk & Nichols, of Topeka, argued the cause, and *Herbert A. Marshall,* of the same firm, was with him on the brief for appellee Aquamarine Corporation.

*William M. Henry,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee Kansas State Park and Resources Authority.

*Marla Luckert,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka, argued the cause, and *Thomas E. Wright,* of the same firm, was with her on the brief for appellee Robert E. Masters, Sheriff of Osage County.

The opinion of the court was delivered by

HARRY G. MILLER, District Judge Retired: On the evening of June 17, 1978, the Whippoorwill Showboat was struck by high winds and capsized on Lake Pomona. Sixteen persons lost their

lives. The appeals involved here are from summary judgments granted by the district court in favor of defendants Robert E. Masters, Sheriff of Osage County, the Kansas State Park and Resources Authority, and the Aquamarine Corporation, in seven actions resulting from the tragedy.

In order to understand the relationship which existed between the parties on June 17, 1978, it is necessary to go back over a decade to examine the various agreements which gave rise to the grant under which the Whippoorwill was being operated.

The Pomona Lake project, a federally financed project, was started July 7, 1959. The dam was closed on July 19, 1962, and the multipurpose lake was filled to its capacity on October 18, 1963.

Portions of the Pomona Lake are designated as a State Park pursuant to K.S.A. 74-4501 *et seq.*, and the Kansas State Park and Resources Authority (the Park Authority), was vested with the exclusive power to supervise and control recreational and park facilities at the lake, including authority to operate or lease park facilities, prescribe rules and regulations for the use of the parks, and to execute all contracts necessary to the performance of its duties.

On December 9, 1965, the Park Authority granted to Lighthouse Marine, Inc. (Lighthouse), the exclusive concession rights to Lake Pomona State Park. On October 14, 1969, Aquamarine Corporation (Aquamarine) was named as exclusive concessionaire in the Vassar area in the park, replacing Lighthouse.

On March 1, 1972, Aquamarine, with the approval of the Park Authority, granted Kansas Steamboat Co., Inc. (Kansas Steamboat) the right to operate excursion type services, particularly steamboat rides, from its marina. On May 2, 1974, Kansas Steamboat assigned its rights under the contract to Bruce and Veda Rogers.

The standards to be followed by a court in considering a motion for summary judgment were expressed in *Farmers State Bank and Trust Co. of Hays v. City of Yates Center,* 229 Kan. 330, 341-342, 624 P.2d 971 (1981), as follows:

"Summary judgment is proper where the only question or questions presented are questions of law. In considering a motion for summary judgment, the party against whom the motion is directed is entitled to the benefit of all reasonable inferences and doubts that may be drawn from the facts under consideration. And where genuine issues of material fact remain undetermined, the granting of summary judgment is improper."

In seeking to impose liability against the Park Authority, plaintiffs charge that the Park Authority breached the concession agreement entered into between it and Aquamarine, the concessionaire, which imposed upon the Park Authority the duty to provide weather warnings to the Whippoorwill and to insure that the vessel was operated in a safe and prudent manner.

Paragraph 19 of the concession agreement of the Park Authority with Aquamarine, dated October 14, 1969, provides:

"Concessionaire and Concessionaire's employees shall at all times operate the subject concessions in a courteous, respectful, and businesslike manner, and the operation and premises shall be maintained in a neat and sanitary condition. Concessionaire and all persons in Concessionaire's employ will at all times be required to give prompt obedience to the orders of the Park Director and other authorized representatives of Authority in regard to construction, installation, equipment and operation of the concession. Concessionaire shall not discriminate against any person or persons because of race, religion, color, or national origin in the conduct of its operations hereunder. In the event the Park Director determines that the Concessionaire or the Concessionaire's employees are not complying with the conditions contained in this paragraph, said Park Director shall promptly notify Concessionaire, or its duly authorized representative, and Concessionaire shall have a reasonable period of time within which to comply with Park Director's request."

The agreement does not spell out any specific duties to be performed by the Park Authority, but plaintiffs contend that by reserving to itself the right to determine whether the concessionaire, or its employees, were complying with the concession agreement in its operations and to issue orders with respect to deficiencies, the Park Authority impliedly obligated itself to make the appropriate efforts to ascertain whether the concession was being operated in a safe manner.

More specifically, plaintiffs argue that the Park Authority breached its contractual duty by failing to adequately inspect the Whippoorwill and to require the installation of a weather band radio on the vessel, and also in not requiring the establishment of a reliable communication link with the Whippoorwill so that the operators could be notified of severe weather warnings.

K.S.A. 74-4510(5) imposed upon the Park Authority the duty:

"To prescribe and enforce rules and regulations . . . to promote public health, safety and decency . . . the inspection of boats, the issuance of permits for operation of watercraft of all kinds, . . . ."

Thus the duties which plaintiffs claim the Park Authority failed to do are duties imposed upon it by law to promote public

safety and exercise due care, and are not duties imposed by contract. Stated otherwise, if there were any duties imposed upon the Park Authority by virtue of the contract, it was to enforce the duties imposed upon it by law.

If, as plaintiffs suggest, the operators of the Whippoorwill came to rely upon the Park Authority by their prior conduct to warn them of severe weather, this again was a duty implied by law. *Sharp v. Sharp,* 154 Kan. 175, 117 P.2d 561 (1941).

The action against the Park Authority, therefore, sounds in tort, and it is immune from liability under K.S.A. 46-901 (Weeks), then in effect, unless it waived its immunity. K.S.A. 46-901 provided that the State and its agencies "shall be immune from liability and suit on an implied contract, or for negligence or any other tort." Plaintiffs will not be permitted to characterize a tort action as one in contract in order to bar governmental immunity. *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 552 P.2d 885 (1976).

In answer to this, plaintiffs argue that the Park Authority waived its immunity by requiring a "hold harmless" provision in the concession agreement and in requiring Aquamarine to procure liability and property insurance, and it contends that the plaintiffs are third-party beneficiaries of this agreement and the agreements between Aquamarine and the operators of the Whippoorwill.

The insurance provisions of the concession agreement upon which the plaintiffs rely are these:

"Concessionaire shall protect, indemnify and hold harmless the Authority and the State of Kansas and the U. S. Army Corps of Engineers from any loss, damage, liability and expense for all injuries or damage to any person or property that may occur in the performance of this contract and from any suit or judgment or other thing whatsoever that shall occur in such performance or growing out of anything done or intended to be done hereunder, provided, however, that the Authority, the State of Kansas, or the United States Army Corps of Engineers, their agents, representatives, successors, or assigns, or any employee thereof, is not directly or indirectly responsible for such injury or damage to any person or property.

"Concessionaire shall procure and maintain, during the term of this contract, public liability and property damage insurance in an insurance company qualified to do business in the State of Kansas, and satisfactory to the Authority. Such insurance shall be in an amount of not less than $25,000 per person and $50,000 for more than one person in any one accident and not less than $10,000 for property damage in any one accident and shall contain appropriate provisions protecting Concessionaire and Authority, as their interests may appear from damage to property which may, directly or indirectly, arise from performance of

this contract. Concessionaire agrees to submit to Authority evidence that such insurance has been provided prior to commencing performance of this Agreement."

The same provisions were in the 1965 concession agreement with Lighthouse.

Plaintiffs direct the court's attention to K.S.A. 74-4715 (Weeks), which authorizes the State to procure liability insurance and to K.S.A. 74-4716 (Weeks), which provides:

"Upon procuring such insurance, the state, city or county thereby waives its governmental immunity from liability for injuries or damages resulting from tortious conduct of its officers, employees or agents during the course of their employment *only to the extent of the insurance so obtained.* Upon issuing such insurance, the insurer or insurers thereby waive any defense based upon the governmental immunity of the state, county or city or their officers, employees or agents." Emphasis supplied.

Since both of these statutes were passed in 1970, the trial court held that the parties to the 1965 and 1969 contracts could not have contemplated waiver through these statutes. We agree.

By the time, however, that Kansas Steamboat was granted excursion rights by Aquamarine on March 1, 1972, and which rights were later assigned to the Rogers on May 2, 1974, K.S.A. 74-4716 (Weeks) had been enacted, and plaintiffs argue that by accepting the assignment requiring the operators of the steamboat to obtain liability insurance containing appropriate provisions to protect the Park Authority, the Park Authority waived its governmental immunity.

The insurance clause and the hold harmless clause were in the 1965 concession contract with Lighthouse at which time the Park Authority enjoyed full immunity under K.S.A. 46-901 (Weeks). The 1969 agreement between the Park Authority and Aquamarine and the subsequent assignments followed *Carroll v. Kittle*, 203 Kan. 841, 457 P.2d 21 (1969), which abolished governmental immunity for proprietary activities. Plaintiffs assert that by leaving these provisions in the contract after *Carroll,* the Park Authority intended to subject itself to tort liability.

We think it is clear from a reading of the "hold harmless" clause that it provides that the concessionaires will indemnify the Park Authority and the State for any damages occurring in the performance of the contract except for those damages for which the Park Authority, the State of Kansas, or the United States Army Corps of Engineers are responsible. Stated otherwise, the Park

Authority has indicated that it will be responsible for its own negligence but not for the negligence of the concessionaire.

In addition, K.S.A. 74-4716 (Weeks), relied upon by plaintiffs, waived the State's immunity only to the extent of the insurance obtained. It is not disputed that none of the policies obtained by Aquamarine or the Rogers named the State or the Park Authority as insureds. Thus, any liability imposed upon the Park Authority would have to be paid from State funds which would defeat the intent and purpose of the waiver statute. *Shriver v. Athletic Council of KSU*, 222 Kan. 216, 564 P.2d 451 (1977).

The plaintiffs advance one further argument. At the time of the Whippoorwill tragedy, K.S.A. 46-901(*c*) (Weeks) was in effect. It provided:

"(*c*)  The state of Kansas and all boards, commissions, departments, agencies, bureaus and institutions and all committees, assemblies and groups declared to be immune from liability and suit under the provisions of subsection (*a*) of this section shall, in all express contracts, written or oral, with members of the public, give notice of such immunity from liability and suit."

Plaintiffs contend that the failure of the Park Authority to give notice of its immunity to Aquamarine, Kansas Steamboat and the Rogers caused a waiver of its immunity.

The statute does not prescribe the consequences of failure to give notice of immunity in a contract. The question as to whether language in a statute is mandatory or directory is to be determined on a case-by-case basis, *Wilcox v. Billings,* 200 Kan. 654, 438 P.2d 108 (1968), and the criterion as to whether such a requirement is mandatory or directory is whether such requirement is essential to preserve the rights of the parties. *Paul v. City of Manhattan,* 212 Kan. 381, 511 P.2d 244 (1973).

The purpose of K.S.A. 46-901(*c*) (Weeks) was to provide notice of governmental immunity to those who dealt with the State. The plaintiffs do not state how failure to observe the notice provisions of the statute is essential to preserve any of their rights in this action.

In conclusion, we hold that the Park Authority did not waive its governmental immunity, and that the trial court did not err in granting summary judgment in favor of the Park Authority as to all claims made by the plaintiffs.

In their claim against Robert Masters, as Sheriff of Osage County, plaintiffs assert that the sheriff is liable to plaintiffs for

negligently failing to maintain a weather warning system as he was bound to do by the Emergency Operations Plan for Osage County and the custom and practice developed over the previous years, and for failing to transmit the severe weather forecast of the weather bureau on the evening of June 17, 1978.

Generally speaking, the sheriff's duty to preserve the peace and protect the public welfare is owed to the public at large and not to particular individuals. This concept of immunity for nonfeasance of public officers was discussed at some length in *Commercial Union Ins. Co. v. City of Wichita,* 217 Kan. 44, 54, 536 P.2d 54 (1975), wherein the court stated:

"Our own rule is that 'executive officers are not liable for errors in the performance of duties involving discretion and judgment, in the absence of malice, oppression in office or wilful misconduct.'"

Plaintiffs do not allege any elements of malice, oppression in office or wilful misconduct on the part of the sheriff or his deputies. Nor is there any evidence of an express agreement on the part of the Sheriff to warn the operators of the Whippoorwill of severe weather. The dissemination of weather information by a government agency or officer is generally held to be a discretionary function. Annot., 99 A.L.R.2d 1016, 1046, § 21; *National Mfg. Co. v. United States,* 210 F.2d 263 (8th Cir. 1954).

It is only where an officer breaches a specific duty owed to an individual that liability arises. *Hendrix v. City of Topeka,* 231 Kan. 113, 643 P.2d 129 (1982).

Plaintiffs argue that by implementing a weather warning system pursuant to the Osage County Emergency Operations Plan, the sheriff created a duty to warn the Park Authority and the concessionaire of severe weather and thereby placed himself in a special relationship with patrons of the park and others who could be potentially endangered by such weather.

This claim is based, apparently, on the emergency plan adopted for Osage County in 1972, which was not in effect at the time of the Whippoorwill disaster. In 1976, a revised emergency plan was adopted which eliminated all requirements for the sheriff to communicate severe weather information to the Park Authority or any concessionaire, or for patrol cars within the park to notify patrons.

Plaintiffs contend, however, that having undertaken the practice over the years of warning the Park Authority, the conces-

sionaire and others of severe weather conditions, the sheriff thereby established a custom or practice which those affected had the right to rely upon.

The record does not support the plaintiffs' contention that there was any such established custom or practice. The uncontroverted facts were that the sheriff's office did broadcast severe weather information by an all-points bulletin which could be received by sheriff's officers, city police, highway patrol, and state park officers, and others who had their radios tuned to the sheriff's radio frequency, but that he had no means of ascertaining who may have heard the broadcast.

The Park Authority was the entity in charge of warnings within the park, and its policy was to contact the operators of the Whippoorwill concerning weather information only when it knew the operators had no other access to weather information. The operators of the Whippoorwill were unaware of any procedure, either formal or informal, of the Park Authority or the sheriff's office to notify them of inclement weather.

Finally, plaintiffs claim that the sheriff was negligent in failing to adequately train his employees as to the duties of the office under the emergency operations plan, and that under the theory of *Monroe v. Darr,* 221 Kan. 281, 559 P.2d 322 (1977), the sheriff was liable on his bond. This theory was not presented to the trial court and is raised for the first time on appeal. Furthermore, the surety on the sheriff's bond is not named as a party defendant in this action.

The decision in the *Monroe* case may be clearly distinguished from the present case. In holding that a sheriff and his surety may be liable on the sheriff's bond for intentional and negligent acts where no malice, wantonness or wilful misconduct is shown, the court stated:

"[T]he acts of the sheriff's deputies in invading the Monroe apartment went beyond the mere exercise of discretion in arriving at an administrative decision. Here, the sheriff's deputies committed acts of actual invasion into the seclusion of the plaintiff's home." 221 Kan. at 288.

No such misfeasance is claimed in the present case.

Assuming arguendo that the sheriff was negligent in failing to properly instruct his employees, as plaintiffs claim, there was no breach of any specific duty owed to the plaintiffs. The duty to instruct his dispatchers was a duty owed to the public and not to any particular individual.

The sheriff was under no duty to warn the Park Authority, the concessionaire, the operators of the Whippoorwill, or the plaintiffs of severe weather, and the trial court did not err in sustaining the sheriff's motion for summary judgment.

Finally, the plaintiffs contend that the trial court erred in granting summary judgment in favor of Aquamarine, and have advanced two theories on appeal to overturn the court's ruling. The first is that the Rogers were independent contractors and that the operation of a vessel such as the Whippoorwill is inherently dangerous, thereby making Aquamarine liable for injuries arising out of such operation. The second theory is that Aquamarine is a concessionaire operating a place of public amusement and is liable for failure to use reasonable care.

Assuming that the Rogers were independent contractors, as contended by plaintiffs, the general rule is that where the relationship exists, the person who engages to have the work done is not liable for the negligence of the contractor in the performance of the work unless such work is inherently dangerous. In *Reilly v. Highman,* 185 Kan. 537, 345 P.2d 652 (1959), the rule is stated:

"[G]enerally speaking, the test of what is to be considered inherently or intrinsically dangerous work is not that the performance of it may possibly produce injury, but rather is based upon a danger which 'inheres' in the performance of the work and results directly from it and not from the collateral negligence of the contractor." 185 Kan. 537, Syl. ¶ 3. See also 57 C.J.S., Master and Servant § 590, p. 362.

The Whippoorwill had operated for twelve years on the water without loss of life, and the trial court correctly ruled that the operation of such a boat is not inherently dangerous. If liability on the part of Aquamarine is to be found, it must be on plaintiffs' second theory.

Aquamarine, in its concession agreement with the Park Authority dated October 14, 1969, acquired from the Park Authority the exclusive concession rights to equip, operate and maintain the concession facilities within the Vassar area of the Pomona State Park, including the right to provide excursion-type services. By agreement dated March 1, 1972, with Kansas Steamboat, Aquamarine granted to Kansas Steamboat the right to provide steamboat rides on the Lake within the framework of Aquamarine's concession agreement with the Park Authority, for a payment of 10% of its gross sales monthly. This contract was approved by the Park Authority, and was assigned to the Rogers on May 2, 1974.

The trial court, in sustaining Aquamarine's motion for summary judgment, found all that Aquamarine acquired from the Park Authority was a license to operate a concession, subject to the control and supervision of the Park Authority, and by assigning to Kansas Steamboat its right to operate a steamboat on the Lake, Aquamarine divested itself of this portion of its concession. It further found that when this concession to operate the steamboat service was assigned to the Rogers, the Rogers acquired only a license to operate the vessel under the supervision and control over them by the Park Authority. The court concluded that Aquamarine did not retain any supervisory power over the operation of the Whippoorwill and, therefore, would not be liable for any injuries arising out of its operation.

The Rogers operated the Whippoorwill solely by virtue of the assignment of this concession right to them, and they agreed to operate within the framework of the concession agreement between Aquamarine and the Park Authority. The Park Authority was not a signatory to this assignment, and although Aquamarine endorsed its acceptance on the assignment, it retained the right provided for in the agreement to cancel the concession upon written notice. There was nothing in the concession granted to Steamboat, or in the assignment to the Rogers, that relieved Aquamarine of its obligations under its own concession agreement with the Park Authority.

It is significant, we believe, that Aquamarine, in negotiating the 1969 concession agreement with the Park Authority, refused to assume the responsibility for direct supervision of the operation of the steamboat excursion service, as the Park Authority suggested, but it was agreed that as long as the excursion service continued to operate, Aquamarine was to be entitled to supervise the operator under arrangements consistent with Aquamarine's responsibilities under the concession agreement.

As Aquamarine and the Rogers interpreted the agreements, the only responsibility imposed upon Aquamarine was to collect the moneys due from the Rogers, make the necessary reports to the Park Authority and provide a mooring facility at the marina. We do not believe this is controlling.

The operation of the Whippoorwill was one of the attractions that brought people to the marina, and Aquamarine had a finan-

cial interest in its operation. The plaintiffs were within the class of persons for whom the concession facilities were operated. Aquamarine was the general concessionaire.

The general rule concerning the liability for negligence of a general concessionaire is stated in 4 Am. Jur. 2d, Amusements and Exhibitions § 64, pp. 186-87 as follows:

"It is generally held that an 'operator' actually engaged in the conduct of a place of amusement, whether as owner, lessee, or general concessionaire, as distinguished from the owner of a place of amusement who merely leases the entire premises to an operator, cannot avoid liability for injuries to patrons resulting from the defective or dangerous condition of the premises or from defective amusement apparatus or devices upon the ground that such premises or devices are under the control of and are used by a concessionaire."

See also Annot., 145 A.L.R. 965; 66 A.L.R.2d 689.

We conclude that under the facts here, Aquamarine was the general concessionaire under the grant from the Park Authority, and that it did not divest itself of all responsibility for operation of the excursion service by the assignment to the Rogers. It owed a duty to exercise reasonable and ordinary care for the safety of the premises and the entertainment facilities used, and it is liable for injuries arising out of its own negligence, if any, in violation of this duty. It would not be liable for injuries arising out of the personal actions of the Rogers or their employees.

The trial court, therefore, erred in granting summary judgment in favor of Aquamarine.

The order of the trial court is affirmed as to defendants John Masters, Sheriff of Osage County, and the Kansas Park and Resources Authority, and reversed as to the defendant Aquamarine Corporation.

FROMME, J., not participating.
APPROVED BY THE COURT.